**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ X
                                            :

GEMINI TRUST COMPANY, LLC,            :

                                            :

                         *Plaintiff*,      :

                                            :      No. 1:23-cv-06864 [rel. 23-2027]

   v.                                      :

                                            :

DIGITAL CURRENCY GROUP, INC. and BARRY   :      Jury Trial Requested
SILBERT,                                        :

                                            :

                         *Defendants*.      :

                                            :
------------------------------------------------------------ X


## <u>AMENDED COMPLAINT</u>

Plaintiff Gemini Trust Company, LLC ("Gemini"), as and for its Amended Complaint against Defendants Digital Currency Group, Inc. ("DCG") and Barry Silbert, alleges as follows.

## NATURE OF THE ACTION

1.     This lawsuit is about fraud. The assets involved—bitcoin and other cryptocurrencies—are relatively novel, but the fraud and deception committed by Defendants are all too familiar. Defendants DCG and Silbert engaged in a fraudulent scheme to induce a variety of depositors, including Gemini users for whom Gemini acted as custodian and agent, to continue to lend huge amounts of cryptocurrency and U.S. Dollars to DCG's subsidiary Genesis Global Capital, LLC ("Genesis"). This lawsuit seeks to recover from Defendants the damages and losses that Gemini has incurred as a direct result of DCG's and Silbert's false, misleading, and incomplete representations and omissions to Gemini, and Defendants' role in encouraging and facilitating Genesis's fraud against Gemini. Gemini is separately pursuing its claims against Genesis in Genesis's pending bankruptcy proceeding under Chapter 11 of the Bankruptcy Code.

2.     Hundreds of thousands of Gemini users elected to provide loans to Genesis pursuant to the Gemini Earn Program (such users, the "Gemini Earn Lenders") under the terms of master loan agreements (the "Gemini Earn MLAs"), among Genesis, each Gemini Earn Lender, and Gemini as custodian and agent for those Gemini Earn Lenders. Genesis obtained these loans (as well as loans from other depositors) for the stated purpose of lending the assets on to other counterparties in the market. Genesis charged those counterparties higher rates and/or fees than it paid to its depositors, allowing Genesis to earn the difference as profit.

3.     From the beginning, Genesis—acting in concert with Defendants and with Defendants' active support and encouragement—induced the Gemini Earn Lenders to lend by touting Genesis's purportedly robust risk-management practices and a supposedly thorough vetting process of the counterparties to which it re-lent the assets. Those were lies. As it turned

out, Genesis was recklessly lending huge amounts to a counterparty that Defendants knew was using these huge amounts to fuel a risky arbitrage trading strategy. DCG and Silbert were all too willing to facilitate feeding that counterparty billions of dollars' worth of Gemini Earn Lenders' assets, because this arbitrage had the effect of massively increasing assets in the Grayscale Bitcoin Trust BTC ("the Bitcoin Trust"), an investment trust managed by Grayscale Investments, LLC ("Grayscale"), another DCG subsidiary. As that trust swelled by billions of dollars' worth of bitcoin, so too did the improbably large fees Grayscale earned for managing it—totaling a staggering $615.42 million in 2021 alone, a windfall that inured to the benefit of DCG and Silbert.

4.     In early 2021, the arbitrage strategy began to fail, causing Genesis's loan counterparty to incur significant losses. Ironically, the strategy faltered in large part because Defendants were intent on preserving the giant fees the Bitcoin Trust was generating. Did Defendants or Genesis disclose to Gemini or other lenders the enormity of Genesis's exposure to a single counterparty that was now sitting on a rapidly imploding arbitrage trade? No. Did Defendants or Genesis begin immediately taking steps to unwind that exposure, increase collateral calls, and otherwise resolve the escalating liability? No. Quite to the contrary, Defendants and Genesis allowed that counterparty to keep those enormous obligations outstanding for another whole year, continuing to reap huge fees on the loan portfolio at Genesis and on the ballooned Bitcoin Trust. Meanwhile, Genesis continued to borrow cryptocurrency assets from Gemini Earn Lenders, again representing that Defendants were careful risk managers. More lies.

5.     In late spring 2022, the music stopped. A Singapore-based hedge fund named Three Arrows Capital ("3AC") collapsed and entered liquidation proceedings. And so began a series of cascading events that led to the present situation. Flouting its representations about risk management and careful vetting of counterparties, Genesis in fact had outstanding loans to 3AC

totaling **2.3 billion**. Over the days and weeks that followed, it also emerged that the collateral held against those loans—which Genesis had represented was generally valued at 80% of its exposure to 3AC—was worth less than 50% of the outstanding liability. In yet another irony, at least some of that missing collateral value was again the result of Defendants' refusal to disturb the giant fee-making investment trust that 3AC's arbitrage strategy had been feeding.[1] By mid-July 2022, it was revealed that, even after accounting for the value of available collateral, Genesis had lost approximately **1.2 billion** on its reckless loans to 3AC—an amount that rendered Genesis insolvent by hundreds of millions of dollars.

6.      Rather than acknowledge that insolvency and face the consequences, however, Defendants and Genesis lied again. Seeking to reassure Gemini to keep the Gemini Earn Program in place, Defendants falsely represented that DCG had absorbed the losses on the 3AC loans at the parent level, and that it was therefore "business as usual" at Genesis. Defendants even caused Genesis to issue a series of financial statements—prepared with the knowledge and active involvement of DCG—showing that DCG had injected $1.1 billion into Genesis as a near-term receivable that would allow Genesis to honor its obligations to depositors. DCG personnel—including, for example, its then-Chief Operating Officer, Mark Murphy—participated in disseminating those misstatements, which creditors were told were prepared with assistance from

---

[1] Some of the collateral Genesis held against the 3AC loans were shares of the Bitcoin Trust that Defendants managed, but the value of those trust shares had been plummeting because Defendants refused to allow trust shares to be converted back into bitcoin (which would have reduced the asset base on which Defendants were earning management fees). In mid-June 2022, shortly after 3AC's collapse, shares of the trust were trading at a roughly 30% discount to the price of the bitcoin in the trust, making the whole of the trust worth **less** than the sum of its parts. (Remarkably, Defendants charge their management fees based on the full value of the bitcoin in the trust, not on the market value of the trust shares.) Although the discount of the trust shares has fluctuated over time, it now stands at roughly 17%.

the "Finance and Accounting teams at **both** DCG and Genesis." As would later become clear, however, DCG did not actually absorb the losses, and Genesis remained wildly insolvent.

7.    Defendant Silbert personally went to great lengths to keep creditors in the dark, perpetuating the lie that DCG had stepped in to "absorb" the 3AC losses. For example, immediately upon learning in mid-October that Gemini had given 30 days' notice of its termination of the Gemini Earn Program, Silbert personally contacted one of Gemini's founders to arrange a face-to-face lunch meeting. At that meeting, Silbert urged Gemini to continue the Gemini Earn Program. Silbert knew that Genesis was massively insolvent, but did not disclose that fact to Gemini. Indeed, Silbert went far beyond that fraudulent omission, representing to Gemini that, although the Genesis loan portfolio was "complex," it could be successfully unwound within a reasonable period of time. That is, Silbert told Gemini that Genesis faced only a short-term mismatch in the **timing** of its loan portfolio, concealing the reality that Genesis had a massive hole in its balance sheet and would be **unable** to honor its obligations to Gemini and others, because DCG had not actually assumed the 3AC losses. In direct reliance on Silbert's misrepresentations, Gemini elected to delay the termination of the Gemini Earn Program—and not to explore the possibility of pursuing more rapid termination or other relief, as Gemini would have done if Silbert had told the truth.

8.    In mid-November, following the much-publicized collapse of the cryptocurrency exchange FTX, Genesis disclosed that it had financial exposure to FTX, and Genesis depositors began invoking their contractual rights to recall their loans. Genesis refused to honor its obligations and suspended all withdrawals of borrowed cryptocurrency. Defendants ultimately revealed that the $1.1 billion infusion by DCG was, in reality, a purported promissory note that **was not due until 2032** (and accrued a measly 1% interest in the meantime). Thus, far from absorbing the losses

Genesis suffered on its loans to 3AC, DCG had made only a theoretical, paper investment in Genesis that was (on any plausible present-value basis) worth a small fraction of the investment Defendants had publicly claimed to have made. And of particularly immediate concern, a promise by DCG to pay Genesis cash in 10 years offered Genesis no practical ability to honor its obligations to the Gemini Earn Lenders and other depositors—hence Genesis's suspension of all withdrawals. The $1.1 billion promissory note was tailor-made to deceive Gemini and others. Defendants devised the instrument so that it could be deliberately misrepresented as a significant capital and liquidity infusion by DCG into Genesis, when in reality it did virtually nothing to address the damage inflicted upon Genesis by the 3AC collapse. The promissory note was, in short, a bid by Defendants and Genesis to grab headlines claiming that DCG had given full and meaningful financial support to Genesis, while concealing the reality that Genesis remained financially crippled following the 3AC collapse.

9.     To make matters worse, within days of 3AC's collapse, Defendants had induced Genesis to *lend out* bitcoin worth more than $355 million to DCG International, another DCG subsidiary. Defendants thus plundered Genesis's already limited liquidity at a time when it was most needed. What is more, Defendants caused Genesis to extend that loan on a completely unsecured basis and at an interest rate of just 3.85%. Defendants' actions are akin to the FDIC announcing that it had shored up a failing bank, while secretly depleting the bank's liquidity by causing it to make below-market loans to the federal government. Adding insult to injury, that bitcoin loan to DCG International was not repaid in advance of the Genesis bankruptcy; rather, Defendants let Genesis collapse entirely while claiming they had "negotiated" a May 2023 maturity date for the loan. That promise likewise proved illusory, because Defendants continue to refuse to pay back the loan, which currently remains outstanding in an amount of bitcoin worth

more than $118 million, even though that principal amount has been overdue for more than four months. Defendants have consistently and repeatedly inflicted financial harm on Genesis for their own benefit, while misrepresenting to Plaintiffs and others that DCG was providing meaningful financial support to Genesis.

10.     In sum, it is now clear that Defendants conspired with Genesis to conceal from Gemini and depositors the fact that the 3AC losses had mortally wounded Genesis, and that DCG had not actually stepped in to preserve Genesis's ability to meet its obligations to depositors. Rather, Defendants and Genesis lied over and over again to keep the revenue flowing and prevent depositors from withdrawing capital from Genesis.

11.     In the months since, Gemini has worked tirelessly toward a solution that would result in the return of assets to the Gemini Earn Lenders. Despite paying public lip service to that goal, however, Defendants have now revealed their transparent intent to conceal their own misconduct and blame it entirely on Genesis. To that end, on January 19, 2023, Genesis filed a petition for relief under Chapter 11 of the Bankruptcy Code. Since then, Gemini has worked with other parties in the bankruptcy to reach agreement on a consensual restructuring that would maximize recovery for Gemini Earn Lenders from Genesis in the bankruptcy proceedings without prolonged delay. Despite Defendants' central role in the collapse of Genesis, they continue to deny financial responsibility, and Genesis remains mired in Chapter 11 proceedings with no end in sight.

12.     Because Defendants are not debtors in Genesis's bankruptcy, they are not entitled to the benefits of the Bankruptcy Code's automatic stay and thus cannot further delay their day of reckoning. And Gemini has been directly harmed by Defendants' wrongful campaign of fraud: Following Genesis's breach of its obligations under the Gemini Earn MLAs by suspending withdrawals on November 16, 2022, dozens of claims have been asserted against Gemini seeking,

among other things, the return of digital assets loaned to Genesis and other damages relating to the Gemini Earn Program. Gemini is vigorously defending itself in those proceedings, and is confident of its ultimate success. But Gemini has already incurred millions of dollars in attorney's fees and litigation expenses in defending against these claims and in Genesis's Chapter 11 proceeding, and faces additional potential or actual liability stemming from the Genesis collapse and Defendants' misrepresentations. That sum—which continues to grow by day—is a direct result of Defendants' fraud.[2]

13.     This proceeding seeks to hold Defendants accountable for their repeated lies to Gemini, and for the consequences of their unlawful scheme with Genesis.

## THE PARTIES, JURISDICTION, AND VENUE

14.     Plaintiff Gemini Trust Company, LLC is a trust company organized under the laws of the State of New York with its principal place of business in New York, New York. Gemini operates a cryptocurrency platform that enables its users to buy, sell, and store cryptocurrencies. Beginning in 2021, Gemini, in its capacity as its users' agent, entered into the Gemini Earn MLAs with Genesis to enable participating Gemini Earn Lenders to lend their digital assets to Genesis.

15.     Defendant Digital Currency Group, Inc. is a cryptocurrency conglomerate that is the ultimate parent company of Genesis and various other non-parties operating in the digital asset industry under the DCG corporate umbrella. DCG is a corporation organized under the laws of the State of Delaware, with its corporate headquarters in Stamford, Connecticut. Upon information and belief, DCG was headquartered in New York County, New York until late 2021 or early 2022.

---

[2] Gemini has sought recovery from Genesis for its role in the fraudulent scheme by filing proofs of claim in Genesis's bankruptcy case, an example of which is attached hereto as Exhibit A.

16.     Defendant Barry Silbert is the founder and chief executive officer of Defendant DCG, as well as the founder of Genesis and other non-parties operating in the digital asset industry under the DCG corporate umbrella. Silbert is the controlling shareholder in DCG and thus reaps substantial personal financial rewards from gains realized by DCG and its subsidiaries. Upon information and belief, Silbert resides in Rye, New York.

17.     Non-party Genesis Global Capital, LLC is a provider of lending and borrowing services for digital assets and fiat currency. It is a limited liability company organized under the laws of Delaware with its principal place of business in New Jersey. Its ultimate parent company is Defendant DCG.

18.     This civil action was originally filed in New York State Supreme Court, New York County, on July 7, 2023. On August 4, 2023, Defendants removed this civil action to this Court pursuant to 28 U.S.C. § 1452, which authorizes removal of a civil action "to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under Section 1334 of this title." 28 U.S.C. § 1452(a). This Court has jurisdiction over this civil action under 28 U.S.C. § 1334(b) because it is "related to" the jointly administered Chapter 11 cases initiated by Genesis and certain affiliates on January 19, 2023. *See In re Genesis Global Holdco, LLC, et al.*, No. 23-10063-SHL (Bankr. S.D.N.Y.).

## **FACTUAL BACKGROUND**

### A.     **The Genesis/DCG Group**

19.     According to information posted on DCG's website prior to Genesis's bankruptcy, "Genesis provides the full suite of services global investors require for their digital asset portfolios. It offers digital asset OTC lending, institutional lending, and prime services."

20.     Genesis is one of several companies within the "Genesis/DCG Group" that is ultimately owned by DCG. Here is an organizational chart of the "Genesis/DCG Group" provided by Genesis to Gemini:



21.     DCG and Silbert are and were at all relevant times actively involved in the operations of Genesis. DCG and Silbert personally were involved in the fraud described below.

22.     One particularly important part of the DCG portfolio is Grayscale Investments, LLC ("Grayscale"). Grayscale is another wholly owned subsidiary of DCG. Grayscale is the sponsor of the Grayscale Bitcoin Trust BTC ("the Bitcoin Trust"). The Bitcoin Trust is a closed-end fund that holds bitcoin; the Bitcoin Trust permits accredited investors to contribute bitcoin in exchange for shares of the Bitcoin Trust (stock ticker: GBTC). The Bitcoin Trust was developed to allow investors to purchase trust shares that provided exposure to the bitcoin marketplace without having to directly hold actual bitcoin.

B.      **Genesis's Lending Business And Deposit Relationships**

23.      Since the launch of its lending business in March 2018, Genesis has been among the largest lenders in the cryptocurrency industry. It has been responsible for more than $244.4 billion in cumulative loan originations during that period—including loans denominated in various cryptocurrency assets and in U.S. dollars.[3] At the height of its lending business, in November 2021, Genesis had more than $16 billion in active loans outstanding.[4]

24.      Genesis obtained capital to fund its lending by borrowing from depositors, via loans denominated in various cryptocurrency assets or in U.S. dollars. Its business model was to earn profits based on a spread between the rates paid to depositors to borrow their assets and the rates it could receive from borrowers in exchange for lending those assets.

25.      In February 2021, Gemini began offering a new program, called Gemini Earn, that gave Gemini's users the opportunity to choose to loan their digital assets to Genesis.

26.      Lending by such Gemini Earn Lenders is governed by three-party Gemini Earn MLAs, each of which was executed by an individual Gemini Earn Lender, by Genesis as Borrower, and by Gemini as Custodian and authorized agent for the Gemini Earn Lender. The Gemini Earn MLAs set forth general terms of the lending relationship, while individual loan transactions were effectuated and recorded through Gemini Earn's online interface.

27.      As of the filing of Genesis's Chapter 11 proceeding in January 2023, Gemini Earn Lenders had loans outstanding to Genesis worth hundreds of millions of dollars in the aggregate.[5]

---

[3] *See* Genesis Q3 2022 Market Observations 4, https://info.genesistrading.com/hubfs/quarterly-reports/2022/Genesis22Q3QuarterlyReport.pdf.

[4]*See* Genesis Q4 2021 Market Observations 6 https://link.genesistrading.com/34ywD3c.

[5] On May 22, 2023, Gemini, acting in accordance with the Bar Date Order entered by the bankruptcy court in Genesis's Chapter 11 proceeding, asserted a claim on behalf of the Gemini

(Continued . . .)

C.     **Genesis Induces Depositors To Lend By Assuring Them That It Responsibly Manages Its Loan Portfolio**

28.     Prior to the events described in this Complaint, Genesis had a good reputation in the industry and was viewed as very sophisticated.

29.     In order to induce potential depositors to lend their assets, Genesis depicted itself as a careful and responsible financial institution. For example, Genesis's website described the company as a "Trusted Partner."

30.     When Genesis sought to initiate the Gemini Earn Program and begin its lending relationships with Gemini Earn Lenders, Genesis shared its "Overview of Enterprise Credit Risk Management" (the "Overview"). That document declared that Genesis had "many levers to pull to ensure Genesis is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools." It emphasized Genesis's "ability to responsibly manage credit risk and face zero defaults" and to "maintain a consistently high level of creditworthiness across our entire loan portfolio."

31.     In the Overview, Genesis assured that, "[a]side from credit extension, Genesis primarily lends on an 'over-collateralized' basis – i.e., the collateral pledged exceeds the value of the loan." With respect to unsecured credit, Genesis promised that "it would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance."

---

Earn Lenders for an amount exceeding $1.122 billion. That amount, however, was asserted to preserve all claims against Genesis (and its affiliated Chapter 11 debtors) in the broadest fashion, and thus does not account for the value of certain foreclosed collateral and reserve amounts. Gemini specifically reserved the right to apply that foreclosed value and reserve amount to the outstanding debts owed by Genesis to the Gemini Earn Lenders, which would have the effect of reducing Genesis's aggregate liability to the Gemini Earn Lenders.

32.     Genesis used the Overview to give Gemini the clear impression that Genesis was a responsible financial institution, touting purportedly sound risk-management practices and a safe loan book.

**D.     Genesis Makes False Representations Of Solvency**

33.     A core requirement for many Genesis depositors was an assurance that Genesis was and would remain solvent.

34.     Thus, in the Gemini Earn MLAs, Genesis warranted to Gemini and each participating Gemini Earn Lender:

> [Genesis] hereby make[s] the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:
>
> . . .
>
> (e) ***[Genesis] represents and warrants that it is not insolvent*** and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.[6]

35.     The "Solvency Warranty" quoted above was material. It has two particularly important features.

36.     First, the Solvency Warranty "shall continue" during the term of the Gemini Earn MLAs. Accordingly, Genesis continued to warrant that it was solvent at all times, even *after* it unlawfully paused withdrawals by depositors.

37.     Second, Genesis made the Solvency Warranty every time an individual depositor made a Loan to Genesis pursuant to a Gemini Earn MLA—deposits that Genesis continued to accept right up until it suspended withdrawals. Each time Genesis accepted a loan after it was insolvent, that was an individual act of fraud.

---

[6]     Unless otherwise stated, all emphasis is added.

38.     Facts demonstrating that Genesis had been—and was known by Defendants to be—insolvent for months are alleged below.

### E.     Genesis's Accumulation Of $2.3 Billion Exposure To 3AC

39.     Genesis's calculated facade as a responsible actor—and thus a responsible counterparty to whom Gemini Earn Lenders trusted their assets—was revealed to be entirely fictitious in the wake of the 3AC collapse.

40.     In June 2022, rumors swirled that Genesis had outsized exposure to 3AC, a large crypto-focused hedge fund that had managed around $10 billion in assets at its peak, but which had recently collapsed.

41.     On June 17, 2022, Michael Moro, Genesis's then-CEO, sought to reassure the market by posting on Twitter "that we carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call to us earlier this week. No client funds are impacted. We sold and/or hedged all of the liquid collateral on hand to minimize any downside."[7] Moro was absolutely clear that the losses would not affect Genesis's ongoing business: "We will actively pursue recovery on any potential residual loss through all means available, however **our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on.**"

42.     News subsequently emerged that liquidators had been appointed for 3AC in the British Virgin Islands.

43.     At that point, on July 6, 2022, Moro returned to Twitter and offered additional reassurances to the market. He explained that, "[w]e previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call. Now that the BVI

---

[7] https://twitter.com/michaelmoro/status/1537822423806009344

bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital."[8] Moro asserted that "[t]he loans to this counterparty had a weighted average margin requirement of over 80%. Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside." He then claimed that, "[s]ince then, we worked with [DCG] to find the optimal strategy to further isolate the risk. **DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term.**" In sum, Moro asserted that "[w]e deploy a number of risk management strategies to ring-fence our portfolio and utilize all capabilities to mitigate losses quickly and effectively."

44.     As details continued to emerge from 3AC's liquidation proceeding, the scale of Genesis's losses—and the scale of its recklessness—became clear. At the time of 3AC's collapse, 3AC owed an astonishing *$2.36 billion* to Genesis (via 3AC's obligations to Genesis's Singapore-based affiliate). And although Moro had asserted that 3AC's loans had a collateralization requirement in excess of 80%, Genesis was able to realize just $1.16 billion when it liquidated 3AC's position. That is, Genesis held collateral ultimately worth less than 50% of the outstanding loan amount, suffering a loss of roughly $1.2 billion at the time 3AC's liquidation commenced. And Genesis had little hope of recovering any substantial value from 3AC's liquidation, as 3AC's founders had absconded and left the liquidators searching for assets to distribute to creditors.

45.     3AC's house of cards—which collapsed so calamitously—was the product of conflicts of interest, self-dealing, and sham governance within the broader DCG corporate family.

46.     3AC borrowed from Genesis to fund a risky Net Asset Value ("NAV") trade by which 3AC attempted to capture the premium on the shares of the Grayscale Bitcoin Trust. The

---

[8] https://twitter.com/michaelmoro/status/1544733042849320960

Bitcoin Trust was founded by Silbert in 2013; as noted above, the Bitcoin Trust holds bitcoin and permits accredited investors to contribute bitcoin in exchange for shares (ticker: GBTC). Newly issued GBTC shares cannot be transferred or sold for a period of six months after issuance (formerly, twelve months after issuance).

47.    At the time 3AC began its trade, GBTC shares traded at a significant ***premium*** to the NAV of the trust—*i.e.*, the market price of trust shares was greater than the market value of the underlying bitcoin held by the trust. That premium opened up the possibility of a profitable NAV trade: An investor like 3AC could borrow to source bitcoin, contribute that bitcoin to the Bitcoin Trust in exchange for new GBTC shares, hold the GBTC shares for the required holding period, and then sell the GBTC shares at a premium in order to repay the bitcoin loan and earn a profit. The success of that strategy depended on GBTC shares continuing to trade at a premium to the NAV of the trust once the six-month holding period for new GBTC shares had run.

48.    It was in DCG's (and, given his massive personal ownership stake in DCG, Silbert's) interest to fuel the creation of new GBTC shares in this reckless manner because Grayscale—another wholly owned subsidiary of DCG—receives significant compensation as the Sponsor of the Bitcoin Trust. For administering the trust's operations, Grayscale collects a 2.0% annual fee calculated by reference to the NAV—*i.e.*, the market value of its underlying bitcoin holdings. This means that the issuance of new GBTC shares—which requires the contribution of new bitcoin into the trust—increases the fee that is paid to Grayscale. And because operation of the Bitcoin Trust requires only trivial expenses, that fee is nearly all profit for Grayscale—and ultimately for DCG, its corporate parent, and Silbert, DCG's controlling shareholder.

49.    During the first quarter of 2021, the market shifted and GBTC's premium to NAV flipped to a discount. In other words, GBTC shares were now worth significantly *less* than the

market value of the underlying bitcoin that has been contributed to the trust. And that discount has both persisted and fluctuated over time—leading to significant losses for investors, such as 3AC, who had bet that GBTC could be sold for more than the value of the underlying bitcoin that they contributed to the Bitcoin Trust to create their GBTC shares.

50.     Put simply, if Genesis had been acting in furtherance of its own independent interests, it is inconceivable that it would have extended unsecured credit in such an astronomical amount to *any* single counterparty—let alone to a hedge fund engaged in the risky NAV trade that 3AC was pursuing. Genesis behaved in this reckless and irresponsible manner because it had conspired with DCG and Silbert—who stood to directly benefit from the increase of bitcoin in the Bitcoin Trust and resulting Grayscale fees.

**F.     Defendants Fraudulently Induce Depositors To Continue Lending By Misrepresenting DCG's Support For Genesis And Genesis's Financial Condition**

**1.     Genesis Repeatedly Invokes DCG's Supposed Support**

51.     In the aftermath of 3AC's collapse—and the public revelation of Genesis's $1.2 billion loss—Genesis's prospects were tied directly to assurances that DCG, its corporate parent, had absorbed the losses. As noted above, Genesis CEO Michael Moro assured the public that Genesis had "worked with [DCG] to find the optimal strategy to further isolate the risk" stemming from 3AC's collapse, and that "DCG has assumed certain liabilities of Genesis related to this counterparty **to ensure we have the capital** to operate and scale our business for the long-term." And weeks earlier, he had told the public that the "potential loss is finite and can be netted against our own balance sheet as an organization," assuring that Genesis had "shed the risk and moved on."

52.     Other Genesis employees offered similar assurances on behalf of the company.

53.     On July 18, 2022, when Genesis had learned that information regarding its losses from the 3AC collapse would soon be reported publicly, Matt Ballensweig, then Managing Director and Co-Head of both Trading and Lending for Genesis contacted a Gemini Senior Associate for Market Risk by Telegram Messenger to "get ahead" of the news. Ballensweig reassured Gemini that "[n]one of this is new information" and that "all of our loses [sic] have already been absorbed by DCG/realized on our balance sheet." He further reassured that "all of the losses have already been reflected and are with DCG."

54.     These misrepresentations were also made to other Genesis depositors. For example, on July 3, 2022, Hamill Serrant of Genesis emailed a representative of Bitvavo Custody B.V. ("Bitvavo"), another Genesis depositor based in Amsterdam, Netherlands. Serrant wrote that "we're still working through the final accounting on the total residual loss," which would be reflected in forthcoming financial statements, but added that Genesis had "netted any losses against our own organizations [sic] balance sheet."

55.     On July 18, 2022, Ballensweig assured another Genesis depositor that "at this time, all of the losses to 3AC have already been absorbed at our parent company, DCG – Genesis' balance sheet remains strong and we continue to operate BAU [*i.e.*, business as usual]." He added that "**_the residual losses were what was absorbed by DCG directly._**"

56.     In each instance, Genesis's statements were deliberately calculated to represent that DCG had stepped in to provide an immediate injection of capital to offset the $1.2 billion loss that Genesis incurred as a result of 3AC's collapse—such that the loss would not affect Genesis's depositors.

2. **In Actuality, DCG Provided Only An Illusory Contribution Via A Ten-Year, 1% Promissory Note Worth (At Most) A Fraction Of Its $1.1 Billion Face Value**

57.     Behind-the-scenes, however, DCG and Genesis agreed to a sham transaction that hardly resembles the story that they were telling to creditors and the public. Defendant Silbert executed an unsecured promissory note, dated June 30, 2022, on behalf of Defendant DCG payable to Genesis in the amount of $1.1 billion (the "DCG Promissory Note"). The terms of the DCG Promissory Note were devised by Defendants to mislead. More particularly, those terms facilitated Genesis putting the DCG Promissory Note as an asset on its balance sheet at face value, purportedly to "offset" approximately 90% of the $1.2 billion loss it incurred from 3AC's collapse. In reality, however, the fair market value of the promissory note was just a small fraction of its $1.1 billion face amount. The note would not mature for 10 years—not until June 30, 2032—and bears interest at a rate of just 1%, which is vastly below the market interest rate that DCG would be required to pay for unsecured borrowing.

58.     Genesis had told its depositors that the 3AC losses had been "assumed" or "absorbed" by DCG—that is, that Genesis had *already* been made whole for the entirety of its $1.2 billion loss. But the promissory note did no such thing. Nor did the promissory note improve Genesis's immediate liquidity position. Even the paltry 1% interest that accrued could—at DCG's option—be paid in kind, which meant that Genesis would not be entitled to *any* cash on account of the DCG Promissory Note for the full 10 years. In practical terms, the DCG Promissory Note was a mere paper obligation—a fraudulent accounting trick designed to make it appear as if Genesis had positive equity and sufficient liquidity to be able to meet its obligations to its depositors, without requiring DCG to commit the financial support that would have been required to actually make Genesis whole for its losses. Genesis had not, in fact, "shed the risk" of the 3AC

collapse as it had claimed, but instead remained wildly insolvent. Defendants knew that, yet worked hand-in-hand with Genesis to hide that fact from Genesis's depositors.

### 3. DCG And Genesis Misrepresent The Nature Of The DCG Promissory Note And Genesis's Financial Condition

59.     The DCG Promissory Note purports to be dated June 30, 2022, but no copies were made available to Gemini or others until later. In any event, DCG and Genesis almost immediately began misrepresenting the nature of the loan purportedly documented in the DCG Promissory Note and, more generally, Genesis's financial condition.

60.     For starters, no one from DCG or Genesis corrected Moro's false and misleading public statements about the support that Genesis had supposedly received from DCG. To the contrary, Defendants conspired with Genesis to devise the structure and terms of the DCG Promissory Note for the purpose of facilitating Moro's and Genesis's false statements regarding Genesis's financial condition. The 3AC collapse left Genesis with a gaping $1.2 billion hole in its balance sheet, and lacking liquidity necessary to honor its repayment obligations to lenders such as Gemini Earn customers and others. The DCG Promissory Note was designed to provide Genesis with a headline amount of the $1.1 billion face value that it could misrepresent as both repairing the Genesis balance sheet and ensuring significant near-term liquidity, when in reality it accomplished neither objective.

61.     Indeed, the fact that Defendants designed the DCG Promissory Note to facilitate deception is further demonstrated by the revelation that Defendants caused Genesis to lend DCG's subsidiary, DCG International, bitcoin worth more than $355 million within days of the 3AC collapse. At the very moment when Genesis was in desperate need of liquidity, Defendants were siphoning its liquidity away for their own benefit—at an interest rate of just 3.85%, no less, further depriving Genesis of the resources it desperately needed. That action is of a piece with Defendants'

deception in devising the DCG Promissory Note—namely, acting to further their own financial interests at Genesis's expense.

62.     To make matters worse, following creation of the DCG Promissory Note, DCG and Genesis also distributed a series of fictitious financial reports, accompanied by false and misleading statements about the support Genesis had supposedly received from DCG. Those reports and misstatements were designed to, and did, hide the truth from Gemini and Genesis depositors.

63.     For example, on July 6, 2022, representatives of Genesis spoke to Gemini representatives (the "July 6 Call"). People participating from Gemini wanted accurate information about Genesis's financial condition.

64.     During the July 6 Call, Genesis representatives made false and misleading statements about Genesis's financial condition. These included false statements about Genesis's assets and the nature of the collateral it was holding against loans Genesis had made.

65.     Following the July 6 Call, Matt Ballensweig of Genesis sent an email to Gemini (the "July 6 Email") attaching three documents. The July 6 Email and its attachments contained multiple false statements.

66.     One attachment to the July 6 Email is a document entitled "Three Arrows Post-Mortem." This document stated, in part:

> We previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call. Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital.
>
> The loans to this counterparty had a weighted average margin requirement of over 80%. Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside.
>
> Since then, we worked with DCG to find the optimal strategy to further isolate the risk. ***DCG has assumed certain liabilities of Genesis related to this counterparty***

*to ensure we have the capital to operate and scale our business for the long-term.*

67.     Statements in the "Three Arrows Post-Mortem" were false. It was not true that "DCG has assumed certain liabilities of Genesis." It was not true that Genesis ensured that it had the "capital to operate . . . for the long term."

68.     The second document attached to the July 6 Email is entitled "Gemini Risk Metric Request" and has a section titled "Financial Position per Asset." It included the following table:

| | Current | Receivable | | Liabilities | |
|---|---|---|---|---|---|
| | Assets | Loans | Collateral Rec. | Borrows | Collateral Pay. |
| Total | $3,377,241,616 | $4,449,809,050 | $2,845,541,484 | $7,178,964,609 | $3,401,109,542 |
| USD / Stables | $697,626,546 | $2,302,015,337 | $182,699,279 | $3,913,570,170 | $901,183,977 |
| BTC | $376,993,113 | $1,383,698,893 | $668,600,703 | $2,130,962,286 | $277,037,598 |
| ETH | $205,767,255 | $558,439,389 | $581,873,409 | $769,744,681 | $582,174,981 |
| Other Assets | $2,096,854,702 | $205,655,432 | $1,268,146,027 | $364,687,472 | $1,640,712,985 |
| **Assets** | **$10,672,592,150** | **Liabilities** | **$10,580,074,150** | **Equity** | **$92,518,000** |

69.     The table in the Gemini Risk Metric Request document is a fraud, because it includes the DCG Promissory Note as a "Current Asset" (within "Other Assets").

70.     As a matter of generally accepted accounting principles—and common understanding—a "current asset" refers to cash and other resources that are reasonably expected to be realized in cash within a one-year period.[9] The term thus specifically *excludes* amounts that are owed by an affiliate but are not collectible in the ordinary course of business within a year.[10]

71.     By including the DCG Promissory Note at its full-face value within the category of "Current Assets," Genesis falsely represented that there was $1.1 billion in value on its balance sheet that could be collected in cash within one year. The promissory note is worth only a fraction

---

[9] *See, e.g.*, FASB Accounting Standards Codification ¶¶ 210-10-45-1, 210-10-45-3.

[10] *See, e.g.*, FASB Accounting Standards Codification ¶ 210-10-45-1.d; *id.* ¶ 210-10-45-4.c ("current assets" do not encompass "Receivables arising from unusual transactions (such as . . . loans or advances to affiliates, officers, or employees) that are not expected to be collected within 12 months.").

of its notional value and does not mature for 10 years. The note is plainly not a current asset, but Genesis falsely presented it as one in order to lull Gemini into continuing the Gemini Earn Program.

72.    It is not a matter of conjecture that the DCG Promissory Note is included in the "Current Assets" category in the Financial Position per Asset table. Gemini specifically inquired about this and received more lies from Genesis in response.

73.    On July 27, 2022, a Gemini representative sent Genesis an email inquiring about the "Other Assets" row in the "Current Assets" column (as depicted by Genesis in a subsequent iteration of the Financial Position per Asset table) and highlighted it:

| | Current | Receivable | | Liabilities | |
| | Assets | Loans | Collat Rec | Borrows | Collat Pay |
| Total | $3,630 | $5,105 | $2,516 | $7,038 | $4,019 |
| USD / Stables | 328 | 2,231 | 177 | 3,466 | 1,159 |
| BTC | 639 | 1,552 | 439 | 2,062 | 279 |
| ETH | 490 | 942 | 422 | 1,061 | 795 |
| Other Assets | 2,173 | 379 | 1,478 | 448 | 1,786 |
| | Assets | $11,251 | Liabilities | $11,057 | Equity | $194 |

74.    Gemini's question on July 27, 2022 was:

Do we know what's included in the $2.2bn other assets? Are they all crypto or a mix of crypto and non-crypto? Can you please shed some light on this?

75.    On July 28, 2022, a Genesis employee sent this response:

"Other assets" is a real-time metric where we looked to replicate, digital currency loans receivable on a real-time basis. This is comprised of a $500mm in alts, $500mm Grayscale shares, $1.1bn in receivables from related parties.

76.    Genesis's July 28, 2022 statement thus confirms that the $1.1 billion DCG Promissory Note was included in the "Other Assets" row in the "Current Assets" column represented on the documents given to Gemini. That was fraudulent. The DCG Promissory Note was not "receivable on a real-time basis."

23

77.     In addition, the Risk Metric report shared with Gemini on July 6 contained another section, labeled "Loan Book Metrics," in which Genesis purported to provide information regarding (among other things) the weighted average duration of its outstanding portfolio of loans. The Loan Book Metrics table stated, falsely, that the overall weighted average duration of Genesis's outstanding loans was just 54.3 days:

**Loan Book Metrics**

*Duration calculated as Expiry Days from Today (Open Term as 7 Days). Rating from 1 to 12 corresponds to A to F rating, directionally*

| | Weighed Avg | | Rating | Rating Characteristics |
|---|---|---|---|---|
| | Loan Duration (Days) | Rating | 1 | de minimis risk profile; excellent capitalization; minimal to no leverage; demonstrable outstanding risk management |
| | | | 2 | |
| | | | 3 | |
| Total | 54.3 | 5.5 | 4 | low risk profile; strong capitalization; solid returns and performance trends; modest leverage; strong risk management |
| USD / Stables | 76.3 | 5.1 | 5 | |
| USDT | 58.9 | 4.4 | 6 | |
| | | | 7 | moderate risk profile; sustained capitalization; sustained positive returns and performance; demonstrable debt service capacity; established risk management |
| BTC | 23.7 | 5.5 | 8 | |
| ETH | 47.2 | 6.6 | 9 | |
| Alt | 33.6 | 6.9 | 10 | minimum acceptable risk profile; short history of results; thin capitalization; adverse developments |
| | | | 11 | event of default; collateral shortfall; cessation of operations; adverse management change |
| | | | 12 | realized loss event; insolvency; fraud |

78.     Genesis's statement that the weighted average duration of Genesis's outstanding loans was just 54.3 days was yet another fraud, because that calculation excluded the $1.1 billion DCG Promissory Note and its 10-year duration. Had the DCG Promissory Note been included, upon information and belief, the resulting calculation would have yielded a weighted average loan duration of more than ***765 days***—approximately ***14 times*** the figure that Genesis falsely reported. Genesis excluded the DCG Promissory Note from its loan-duration calculations in order to conceal the existence and terms of the DCG Promissory Note from Genesis's depositors, thereby misrepresenting Genesis's true financial position.

79.     Another attachment to the July 6 Email purported to be Genesis's balance sheet as of June 30, 2022. This document also materially misrepresented Genesis's financial condition.

80.     As with the "Financial Position per Asset" table, the balance sheet did not disclose the existence of the $1.1 billion promissory note. Instead, apparently, the note was included as an

asset on the balance sheet in a line item labeled "Receivable from related parties"—which had a stated value of approximately $1.137 billion. The note was included on the balance sheet at its full face value of $1.1 billion, even though, as discussed above, its true fair value was only a small fraction of that amount.

81.     The purpose of misrepresenting the DCG Promissory Note's value is obvious: Despite including the note at its full face value, the balance sheet showed "Total member's equity" of just $92.5 million. If the note had been included on the balance sheet at any reasonable estimate of its fair value, it would have disclosed that Genesis was insolvent by *at least* hundreds of millions of dollars.

82.     In the following weeks and months, Genesis made numerous other false statements to Gemini. These included, for example, updates to the false "Risk Metric" document described above, which contained the same Financial Position per Asset table that falsely included the DCG Promissory Note as a Current Asset. These updates were shared on a regular (sometimes daily) basis with Gemini.

### 4.     DCG Is Responsible For Genesis's False Statements To Gemini

83.     DCG itself misled Gemini and Genesis depositors, conspired with Genesis, and aided and abetted Genesis's efforts to mislead through false financial reporting.

84.     As an initial matter, although DCG should and could have corrected Moro's public statements regarding the nature of DCG's support for Genesis, it failed to do so. DCG knew, or reasonably should have known, that Genesis's depositors and other parties, such as Gemini, would rely on Moro's statements regarding DCG's support. DCG's silence in the face of Moro's misstatements demonstrates that DCG likewise intended to mislead depositors. Moreover, the DCG Promissory Note was designed by Defendants to enable that deception by Moro—at a time when Genesis was in dire need of both significant value on its balance sheet and significant near-

term liquidity, Defendants designed an instrument they knew would be misrepresented as providing that support while in reality leaving Genesis in financial peril.

85.     Even more troubling, **key DCG officers and employees directly participated in the effort to mislead via the financial reports**. For example, on July 18, 2022, in response to an email exchange with a representative of Bitvavo, another Genesis depositor, regarding the possibility of a parent guaranty of Genesis's borrowing from DCG, Matt Ballensweig suggested that Bitvavo's representative speak with DCG's then-Chief Operating Officer, Mark Murphy. Ballensweig stated: "I've broached the topic of a guarantee with Mark Murphy, DCG's COO and before we get there, I think it would make sense for you guys to set up a call to go through how DCG has viewed the loss and their plans to support Genesis in perpetuity. There are many implications of establishing a formal guarantee but I think for starters you guys should hop on a call. Let me know if that works and we'll set something up this week."

86.     Previously, on July 7, 2022, Ballensweig had emailed Bivavo's representative and shared the same three attachments that had been shared with Gemini on July 6. Ballensweig's email to Bitvavo attached the "Three Arrows Post-Mortem," including the same misrepresentations described above.

87.     Ballensweig also attached a "Risk Metric" report that was substantially identical to the one that had been shared with Gemini, including the same "Financial Position per Asset" table that falsely included the full $1.1 billion face amount of the DCG Promissory Note as a "Current Asset."

88.     The "Risk Metric" report shared with Bitvavo also presented substantially the same "Loan Book Metrics" table. In that table, Genesis falsely reported a weighted-average loan

duration of 54.3 days—concealing the effect of the DCG Promissory Note that, had it been included, would have caused the calculated figure to balloon to more than ***two years.***

89.     Ballensweig also attached Genesis's purported balance sheet, which falsely valued the DCG Promissory Note as an asset at its full face value of $1.1 billion.

90.     Thus, Genesis fed Bitvavo precisely the same fraudulent financial reports that it had shared with Gemini (and was continuing to share on an ongoing basis).

91.     Then, on July 19, 2022, DCG's then-Chief Operating Officer Murphy held a call with Bitvavo's representative in which he doubled down on Genesis's lies. In substance, speaking on behalf of DCG, Murphy reiterated the false story that had previously been shared with Bitvavo in the same "Three Arrows Post-Mortem" document that Genesis had sent to Gemini. Murphy stated that DCG stepped in to absorb Genesis's losses on its 3AC exposure, and he stated that those losses had been netted against DCG's balance sheet. He further stated that, following DCG's support, Genesis was well capitalized to continue doing business as normal in the future. And he reassured the depositor that Genesis was among the most important parts of the broader DCG empire, that DCG had big plans for Genesis's future business, and that DCG was committed to providing ongoing support to Genesis to allow the company to continue growing.

92.     Each of these statements—made by Murphy on behalf of DCG—was false. Genesis's losses were not absorbed by DCG or netted against DCG's balance sheet. Genesis was insolvent, not well capitalized. And, as evidenced by DCG's failure to provide even the support that Genesis had publicly claimed in the aftermath of 3AC's collapse, DCG in fact had no plans to continue providing ongoing support to Genesis in order to permit Genesis to avoid failure and continue growing.

93.     Murphy made these affirmative misrepresentations as part of DCG's ongoing conspiracy with Genesis. Those misrepresentations demonstrate that DCG was directly aware of the misleading financial statements Genesis issued to Gemini and others, and that DCG was actively involved not only in failing to correct them but also in perpetuating them directly.

94.     Thereafter, Murphy and other DCG representatives were copied on email exchanges in which Genesis continued to provide false information in response to Bitvavo's requests for information. For example, on July 26, 2022, Mark Murphy, then DCG's Chief Operating Officer, was copied on an email exchange in which Genesis's Matt Ballensweig made a series of false statements in response to inquiries from Bitvavo. In that email, Ballensweig explained that his response had been prepared with assistance from the "Finance and Accounting teams at both DCG and Genesis."

95.     As part of his response, Ballensweig provided details about approximately $1.8 billion in lending from Genesis to affiliated entities that had been disclosed in an updated "Risk Metric" report that Ballensweig had shared with Bitvavo by email on July 20, 2022. That updated "Risk Metric" report was substantially identical to one shared with Gemini as an attachment to a July 20, 2022, email from Genesis's Sujal Gandhi to multiple Gemini representatives.

96.     In his July 26, 2022, email to Bitvavo, Ballensweig falsely stated that Genesis had approximately $922 million in outstanding loans to DCG—an amount that purposefully omitted the $1.1 billion promissory note that Defendants sought to conceal from Genesis's depositors. At the same time, Ballensweig falsely stated that DCG had "assumed the $1.1bn loan on June 30, 2022"—a misrepresentation calculated to reassure Bitvavo that Genesis had already been made whole for its loss on the 3AC loans. That was entirely fictitious, but Murphy made no effort to correct Ballensweig's misrepresentations. Nor did Ronald DiPrete, DCG's Head of Special

Projects, Finance, who was also copied on the exchange. Rather, by leaving those misstatements uncorrected—particularly against the backdrop of Murphy's prior direct statements falsely attesting to the financial condition of Genesis—DCG's senior personnel tacitly endorsed those lies. This is but another example demonstrating that DCG knew Genesis was in financial straits, knew that Genesis had lied about DCG providing financial support to fill the gaping balance-sheet and liquidity needs at Genesis, and participated in making and perpetuating those misstatements.

97.    Later, on August 16, 2022, Murphy and DiPrete were again copied (along with Jason Yacavone, a Director in DCG's Investments group) when Genesis's Hamill Serrant sent an updated Genesis balance sheet to Bitvavo. The updated balance sheet, dated as of July 29, 2022, once again falsely included the $1.1 billion promissory note at its full face value in a "Receivable from related parties" line item. Even with that false entry, the balance sheet showed "Total member's equity" of just $95.4 million. And once again, none of DCG's representatives lifted a finger to correct the falsehood, preferring instead to keep the public and Genesis creditors in the dark, even though they knew the statements were false.

98.    During this period, DCG's representatives were repeatedly copied on email exchanges with Genesis personnel, in which Genesis provided additional information in response to Bitvavo's questions and requests. But DCG's representatives never stated that the core premise of the parties' discussions—namely, that DCG had already stepped in to absorb Genesis's losses from its 3AC exposure—was false.

99.    The repeated participation of DCG officers and employees in these communications demonstrates that the effort to mislead was an agreed-upon common scheme. Indeed, if DCG and Genesis had not agreed to conceal the existence and terms of the DCG Promissory Note—and thus to misrepresent Genesis's financial condition—then Genesis

personnel would never have included DCG personnel on communications in which they repeatedly shared fraudulent financial statements and lied about Genesis's financial condition. Genesis personnel understood that DCG would not correct those lies, because Genesis and DCG had agreed to defraud Genesis's depositors.

100.   The participation of DCG officers and employees in these communications also assisted Genesis in misleading Genesis's depositors. In the course of their communications with Bitvavo, Genesis representatives repeatedly made statements about financial support from DCG that under all the circumstances DCG's representatives would have been expected to deny if they were untrue. But DCG's representatives did not deny or correct those assertions even though they were untrue. The silence of DCG's representatives thus bolstered Genesis's misrepresentations.

101.   All of this action and inaction by DCG is in keeping with Defendants' manifest purpose in designing the DCG Promissory Note to facilitate deception. As noted above, the basic nature of the DCG Promissory Note demonstrates that DCG was a willing participant in the scheme to mislead Genesis depositors and Gemini. After 3AC's collapse triggered a $1.2 billion loss for Genesis, depositors and Gemini had good reason to question Genesis's liquidity and the solvency of its balance sheet. The DCG Promissory Note was (unbeknownst to depositors at the time) the basis of misrepresentations by Genesis that DCG had covered the loss. But a promissory note such as this would **not** be a rational response to depositors' concerns: The note did not provide **any** short-term liquidity, and (on any reasonable statement of its actual present value on a balance sheet basis) the note represented at most a small fraction of Genesis's loss on the 3AC loan and provided nothing close to the kind of capital injection that would have maintained Genesis's solvency. Indeed, even with the DCG Promissory Note included at its full principal value, Genesis's June 30, 2022 balance sheet showed "Total member's equity" of just $92.5 million. If the value of the

DCG Promissory Note had been fairly presented, the balance sheet would have shown that Genesis was insolvent by hundreds of millions of dollars.

102.    Thus, for both DCG and Genesis, the DCG Promissory Note made sense *only if its existence and terms could be concealed*—because doing so allowed DCG to *pretend* to support Genesis, without taking on the financial cost that would have been required to actually do so. **Put simply, the terms of the promissory note were tailor-made to allow DCG and Genesis to conspire to deceive Genesis depositors**. Knowing Genesis's financial position as Defendants did, they could only have made and structured the Promissory Note knowing it would be used to defraud Gemini and Genesis's depositors. There would have been no point in making the Promissory Note if Defendants believed it would be accurately valued on Genesis's books and accurately described to Genesis's counterparties, because any accurate valuation of the Promissory Note would not have concealed the fact that Genesis was deeply insolvent.

103.    There can be no doubt that DCG knew that falsely representing the DCG Promissory Note's value was necessary to convey the fraudulent misimpression that financial support from DCG had salvaged Genesis's solvency. Genesis's financial statements for prior periods had *never* demonstrated sufficient capital to absorb $1.2 billion in losses if offset only by the minimal value that could be attributed to the DCG Promissory Note on any fair present-value calculation. For example, Genesis's audited balance sheet for the year ended December 31, 2020 showed "Member's equity" of $182.2 million. Genesis's audited balance sheet for the year ended December 31, 2021 showed "Total member's equity" of $425.4 million. And an unaudited balance sheet for the quarter ended March 31, 2022 showed "Total member's equity" of $395.2 million. As a matter of simple arithmetic, with Genesis's equity value in this general range the DCG Promissory Note would not have been sufficient to offset a $1.2 billion loss even if valued at one

half of its $1.1 billion face amount—a valuation that would itself vastly exceed the DCG Promissory Note's true worth on a present-value basis.

104.    Nor can there be any doubt that DCG was deeply familiar with Genesis's financial reporting and financial condition. For starters, and as noted above, senior DCG executives were copied on Serrant's August 16, 2022, email to Bitvavo attaching the fraudulent balance sheet for Genesis dated July 29, 2022. That communication on its own belies any suggestion that DCG was somehow kept in the dark about the finances of one of its key subsidiaries.

105.    In fact, DCG was necessarily familiar with Genesis's finances at all relevant times because, as a key subsidiary, Genesis played a critical role in DCG's own consolidated financials. This dynamic is illustrated by a consolidated balance sheet for DCG that Genesis's Ballensweig shared with Bitavo by email on July 18, 2022. Of the balance sheet's thirteen separate asset line items, no fewer than six were attributed to Genesis as the "Primary Business Unit(s)." Those line items accounted for roughly two thirds of the $12.1 billion in "Total Assets" that DCG reported as of June 30, 2022. On the liability side, four of the six separate line items were attributed to Genesis. And those line items accounted for **more than 95.6%** of the $11.5 billion in total liabilities that DCG reported as of June 30, 2022.

106.    Eliminating any doubt that DCG and Genesis worked hand-in-hand on the deception, multiple present or former Genesis employees have stated as much in correspondence with Genesis depositors. Those communications specifically confirm that DCG's and Genesis's finance and executive teams collaborated to prepare the false financial statements that were shared by Genesis.

107.    DCG and Genesis thus agreed to the misleading financial presentation that would conceal the DCG Promissory Note's existence and its terms from Genesis's depositors.

### G. Barry Silbert Personally Intervenes To Induce Gemini To Continue The Gemini Earn Program

108. Defendant Barry Silbert—DCG's founder and CEO—personally participated in perpetuating the lie that Genesis was solvent and capable of honoring its obligations. On the afternoon of October 13, 2022 (following several direct discussions regarding the future of the Gemini Earn Program), Gemini sent an email to Genesis providing 30 days' notice of the termination of the Gemini Earn Program and the Gemini Earn MLAs. Within 24 hours, Silbert personally emailed Cameron Winklevoss, co-founder of Gemini, seeking a face-to-face meeting. Silbert acknowledged that his request was prompted by the uncertain "future of the Gemini-Genesis lending relationship." Silbert posited that he and Cameron Winklevoss should be exploring "ways to take advantage of the crypto winter" and suggested that "there are a number of ways that Gemini-Genesis-DCG could more closely collaborate."

109. Silbert's request resulted in a lunch meeting between Cameron Winklevoss and Silbert at a restaurant in New York City on October 20, 2022. At that lunch meeting, Silbert made numerous representations designed to induce Gemini not to discontinue the Earn program.

110. Silbert was aware at the time that Genesis was massively insolvent, because— unbeknownst to Gemini and Genesis depositors—DCG had provided Genesis with a 10-year promissory note rather than assuming the 3AC losses as had been claimed. As noted above, Genesis *never* had sufficient equity capital to absorb $1.2 billion in losses from its 3AC exposure if offset only by the paltry value attributable to the DCG Promissory Note. As the Chief Executive Officer of DCG, Silbert was familiar with the financial reports of Genesis, one of DCG's key subsidiaries, or at least with Genesis's general financial condition. And as one of the signatories to the DCG Promissory Note, Silbert was obviously familiar with its terms and understood that it could not have plugged the massive hole in Genesis's solvency created by the 3AC losses.

111.    Silbert further knew that Gemini was operating under the misimpression that Genesis was solvent, which had been generated by the fraudulent financial reporting that was a key component of DCG's unlawful scheme with Genesis.

112.    Despite knowing that Genesis was massively insolvent and that Gemini was operating under the opposite misimpression, Silbert did not disclose that fact to Winklevoss—even as he was urging Gemini to continue the Gemini Earn Program.

113.    Silbert was further aware that DCG had not provided meaningful near-term liquidity to Genesis sufficient to allow Genesis to honor its obligations, again contrary to statements made to Gemini and Genesis depositors. But Silbert withheld that information from Winklevoss as well.

114.    Silbert did more than conceal those numerous material facts. Rather, he created a cover story that was designed to—and did, in fact—affirmatively misrepresent the reason why he was urging Gemini to continue the Earn program. Silbert represented that Genesis simply needed sufficient time to effect an orderly unwinding of its "complex" loan book, and that any difficulty that the termination of the Gemini Earn Program would cause for Genesis was merely a mismatch in the timing of Genesis's loan positions. That is, Silbert affirmatively misrepresented that Genesis faced only a short-term timing mismatch between its outstanding loans and borrowing. At the same time, Silbert's statements indicated deep familiarity with Genesis's finances—foreclosing any suggestion that he was (against all odds) somehow unfamiliar with the financial position of one of DCG's key subsidiaries.

115.    In reality, as Silbert well knew, Genesis's problems ran far deeper than a mere "timing" issue. Genesis had a gaping hole in its balance sheet, because the $1.1 billion of support that DCG had purportedly given Genesis in order to "assume" the Genesis 3AC losses was, in

actuality, the 10-year-distant promissory note. As explained above, the DCG Promissory Note was worth (at most) a tiny fraction of its face value, and it left Genesis insolvent by hundreds of millions of dollars. That is not a question of timing at all, but rather of basic solvency.

116.    Even as to timing, the weighted average duration of Genesis's outstanding loans was **more than 765 days (or more than 2 years)**. The DCG Promissory Note would not bring meaningful value to Genesis for almost **<u>ten years</u>**. That is hardly a "short-term" timing mismatch given Gemini's provision of **<u>30 days'</u>** notice of the termination of the Gemini Earn Program and the Gemini Earn MLAs. Silbert's assertion that Genesis faced only a short-term timing issue was thus an affirmative misrepresentation.

117.    Silbert thus pushed his cover story even further, suggesting that Genesis, DCG, and Gemini should explore an arrangement to collaborate closely in the future.

118.    Silbert's misrepresentations had the desired effect. Relying on Silbert's claims, Gemini elected to delay the termination of the Gemini Earn Program—and not to explore the possibility of pursuing more rapid termination or other relief, as Gemini would have done if Silbert had stated the truth.

119.    Shortly after the meeting, Silbert also caused DCG to negotiate and enter into a November 10 tripartite agreement between and among Genesis, DCG, and Gemini. Pursuant to that agreement, DCG promised to transmit additional collateral in the amount of 31,180,804 shares of GBTC (valued in excess of $626.1 million as of July 6, 2023) to Genesis for the benefit of Gemini Earn Lenders. On information and belief, DCG transmitted the collateral to Genesis but did not instruct or allow Genesis to transfer that collateral to Gemini as agreed. But even assuming that DCG nominally fulfilled its contractual obligation, the real purpose of the agreement was a ruse. By purporting to demonstrate still further support for Genesis's obligations in the form of

collateral—despite knowing that Genesis was massively insolvent—DCG induced Gemini to continue the Gemini Earn Program. Gemini would not have done so if Silbert and DCG had come clean about Genesis's true financial condition, rather than repeatedly misrepresenting it.

120.    Under these circumstances, Silbert and DCG were under a legal obligation not to conceal the true nature of Genesis's financial condition. Silbert and DCG understood that Gemini was relying on the financial information and other representations provided by Genesis—including, in particular, multiple assurances that Genesis's losses relating to 3AC had been absorbed by DCG—as essential facts in deciding whether to terminate the Gemini Earn Program on the 30-day timeline Gemini had previously communicated. Moreover, the falsity of those representations was not discoverable by Gemini through ordinary diligence. Thus, Silbert and DCG were under a legal obligation to speak the truth and to correct those misrepresentations.

121.    Silbert's partial disclosures regarding Genesis's financial condition were equivalent to direct misrepresentations—made on DCG's behalf—regarding Genesis's solvency. Even setting aside Silbert's affirmatively false statement that Genesis faced only a short-term issue, Silbert's assurances that Genesis's problems were a mere "timing" issue were deliberate half-truths, calculated to mislead Gemini into concluding that Genesis was not in fact insolvent.

### H.    Genesis Refuses To Return Its Depositors' Assets

122.    On November 16, 2022, Genesis announced via Twitter that it was suspending redemptions by its depositors, a decision that it attributed to market dislocation resulting from the collapse of Alameda Research, LLC and FTX.

123.    Genesis stated that "FTX events have created an unprecedented market, resulting in abnormal withdrawal requests, which have exceeded our current liquidity." Genesis further stated that, "[i]n consultation with our professional financial advisors and counsel, we have taken

the difficult decision to temporarily suspend redemptions and the new loan origination in the lending business."

124.    Since November 16, Genesis has refused to honor redemption requests from its depositors and has failed to pay interest when due to those depositors. On January 19, 2023, Genesis filed a petition for Chapter 11 bankruptcy relief.

## I.    Defendants' Fraudulent Conduct Harms Gemini

125.    Gemini has been directly harmed by Defendants' wrongful campaign of fraud.

126.    Following Genesis's breach of its obligations under the Gemini Earn MLAs by suspending withdrawals on November 16, 2022, dozens of claims have been asserted against Gemini seeking, among other things, the return of digital assets loaned to Genesis and other damages relating to the Gemini Earn Program. These claims include (i) four putative class-action lawsuits,[11] (ii) nine individual actions filed against Gemini in multiple fora, including state courts and arbitration tribunals,[12] and (iii) one case and multiple investigations commenced by federal and state regulators.[13]

---

[11] The putative class actions are as follows: (1) *Chablaney v. Gemini Trust Company*, LLC, et al., Case No. 650076/2023 (N.Y. Sup. Ct.); (2) *Cobourn v. Gemini Trust Company*, LLC, Case No. 650567/2023 (N.Y. Sup. Ct.); (3) *Moeller-Bertram v. Gemini Trust Company*, LLC, et al., Case No. 23-cv-2027 (S.D.N.Y.); (4) *Picha v. Gemini Trust Company*, LLC, Case No. 1:22-cv-10922 (S.D.N.Y.).

[12] The individual actions include six confidential arbitration proceedings and the following three proceedings: (1) *Gibek v. Gemini Trust LLC*, Case No. SC-002505-22 (N.Y. Ct. Cl.); (2) *Neppl v. Gemini Trust Company, LLC*, Case No. 2022-cv-0477 (Co. El Paso Cnty. Dist. Ct.) and (3) *Rosenbaum*, Dispute Demand Notice in the Consumer Fraud Protection Bureau. Information about the pending arbitrations is confidential.

[13] The case commenced by federal regulators is as follows: *SEC v. Genesis Global Capital, Inc., et al*, Case No. 23-cv-287 (S.D.N.Y.).

127.    Gemini is vigorously defending itself in those proceedings, and is confident of its ultimate success. But Gemini has already incurred more than $6.5 million in attorney's fees and litigation expenses in defending against these claims and in Genesis's Chapter 11 proceeding.

128.    That sum—which continues to grow—is a direct result of Defendants' fraud. Defendants' fraudulent conduct was intended to—and did in fact—induce Gemini to continue the Gemini Earn Program and to refrain from terminating the Gemini Earn Program. But for Defendants' fraud, Gemini would not have kept the Gemini Earn Program in operation and would not have refrained from terminating the Gemini Earn Program—which in turn would have eliminated or reduced the claims asserted against Gemini relating to the Gemini Earn Program.

## CLAIMS FOR RELIEF

### COUNT I
### Fraud

129.    Gemini incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

130.    As described above, Defendants made false representations to Gemini regarding Genesis's financial condition and the support it had received from DCG, and Defendants concealed material facts regarding Genesis's financial condition and the support it had received from DCG under circumstances in which Defendants were under a legal obligation to state the truth.

131.    Defendants knew that their representations were false and that their material omissions would convey false and misleading information to Gemini.

132.    Defendants intended that their representations and omissions would induce Gemini to keep the Gemini Earn Program in place and to refrain from terminating the Gemini Earn Program.

133.    Gemini reasonably relied on Defendants' misrepresentations and omissions, because Defendants would be in the best position to understand and speak accurately about the support that Genesis had received from DCG and the resulting effect on Genesis's financial condition.

134.    As a result of Gemini's reliance on Defendants' misrepresentations, Gemini has been materially and substantially harmed. In particular, because Gemini was induced to keep the Gemini Earn Program in place and to refrain from terminating the Gemini Earn Program, Gemini has been exposed to claims by Gemini Earn Lenders who have been unable to withdraw their loaned assets from Genesis and has incurred significant attorney's fees and litigation expenses in defending against those claims and in Genesis's Chapter 11 proceeding.

135.    In addition, and as described above, Defendants have conspired with one another and with Genesis to engage in this fraudulent scheme.

136.    As a result of their conspiracy, Defendants are jointly liable for one another's tortious conduct directed towards Gemini and for Genesis's tortious conduct directed toward Gemini.

137.    Defendants' fraudulent conduct was willful, egregious, and wanton such that punitive damages are warranted and appropriate.

## COUNT II
### Aiding and Abetting Fraud

138.    Gemini incorporates by reference the allegations contained in the preceding paragraphs as if fully set forth herein.

139.    As described above, Defendants DCG and Silbert have aided and abetted Genesis in making fraudulent misrepresentations to Gemini with respect to Genesis's financial condition and the support it received from DCG. Defendants DCG and Silbert knew about those

misrepresentations, knew they were false, and rendered substantial assistance to Genesis in making them. For that reason, Defendants are jointly liable for one another's tortious conduct directed towards Gemini and for Genesis's tortious conduct directed toward Gemini.

140.    Defendants' fraudulent conduct was willful, egregious, and wanton such that punitive damages are warranted and appropriate.

*Remainder of page intentionally blank*

## PRAYER FOR RELIEF

WHEREFORE, Gemini respectfully requests relief as follows:

A.     An award of actual damages, in an amount to be determined based on the claims

for relief outlined herein;

B      An award of punitive damages, in an amount to be determined at trial based on

the claims for relief outlined herein;

C.     A declaratory judgment that Defendants are liable to Gemini for any additional

damages that Gemini may incur in the future based on the claims for relief

outlined herein;

D.     Reasonable attorney's fees;

E.     The costs of this proceeding; and

F.     Any other relief that is deemed just and proper.

Dated:  New York, New York                    **JFB LEGAL, PLLC**
        September 14, 2023

                                              By /s/ John F. Baughman
                                              John F. Baughman
                                              Andrew Bosse
                                              299 Broadway – Suite 1816
                                              New York, NY 10007
                                              (212) 548-3212

                                              *Attorneys for Gemini Trust Company, LLC*