# **Exhibit A**

# Genesis Proof of Claim Form

## Electronic Proof of Claim ID

If you have an EPOC ID please enter it below and select next to proceed with your claim submission.  EPOC IDs can be located on the pre-printed proof of claim forms sent via first-class mail.

EPOC ID

[                                                                          ]

EPOC IDs are not required to submit a claim.  If you cannot locate your EPOC ID or do not have an EPOC ID, please select next to continue with your claim submission.

## Instructions

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed (January 19, 2023). That date is on the notice of bankruptcy (Form 309) that you received.**

☐  Check here to see further instructions on completing your claim form:

## Debtor Selection

**Fill in this information to identify the case (Select only one Debtor per claim form):**

○ Genesis Global Holdco, LLC (Case No. 23-10063)
◉ Genesis Global Capital, LLC (Case No. 23-10064)
○ Genesis Asia Pacific PTE. LTD. (Case No. 23-10065)

## Part 1: Identify the Claim

**1. Who is the current Creditor?**
Name of the current creditor (the person or entity to be paid for this claim)

Is the current Creditor an Individual?
◉ No
○ Yes

Creditor Name

| Gemini Trust Company, LLC |
|---|

Other names the creditor used with the debtor

|  |
|---|

**2. Has this claim been acquired from someone else?**
◉ No
○ Yes

From whom?

|  |
|---|

**3. Where should notices and payments to the Creditor be sent?**
[Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)]

**Where should notices to the Creditor be sent?**

Name:

| Gemini Trust Company, LLC |
|---|

Address 1 (Street address, "Care of:", or "Attention To:"):

| c/o Anson B. Frelinghuysen, Esq. |
|---|

Address 2:

| Hughes Hubbard & Reed LLP |
|---|

Address 3:

| One Battery Park Plaza |
|---|

Address 4:

|  |
|---|

City:

| New York |
|---|

State or Province (use 2-letter abbreviation if US or Canada):

| NY |
|---|

Zip Code | Postal Code:

| 10004 |
|---|

**Is the creditor address outside of the US?**
◉ No
○ Yes

Genesis Proof of Claim Form

Contact phone:

(212) 837-6000

Contact email:

anson.frelinghuysen@hugheshubbard.com

**Should payments go to a different address?**

○ No
◉ Yes

Name:

Gemini Trust Company, LLC

Address 1 (Street address, "Care of:", or "Attention To:"):

c/o Tyler Meade, Esq.

Address 2:

600 Third Avenue, 2nd Floor

Address 3:

Address 4:

City:

New York

State or Province (use 2-letter abbreviation if US or Canada):

NY

Zip Code | Postal Code:

10016

Is the creditor address outside of the US?

◉ No
○ Yes

Contact phone:

(866) 240-5113

Contact email:

genesisclaims@gemini.com

**Would you like to add any additional noticing addresses?**

◉ No
○ Yes

**4. Does this claim amend one already filed?**

◉ No
○ Yes

Claim number on court claims registry (if known)

**5. Do you know if anyone else has filed a Proof of Claim for this claim?**

◉ No
○ Yes

Who made the earlier filing?

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**6. Do you have any number you use to identify the debtor?**

◉ No
○ Yes

Last 4 digits of the debtor's account or any number you use to identify the debtor:

_____

**\* 7. How much is the claim?** (If your claim is based on cryptocurrency holdings, please provide the number of units associated with your claim. Do not provide a value for your cryptocurrency holding claim in United States Dollars. Only provide a United States Dollar value for your claim if your claim is based in United States Dollars.)

A. To the extent you assert a claim that is denominated in US Dollars, list the value of the claim in US Dollars as of the date the case was filed (January 19, 2023):

| $ | See attached Annex. |

**Does this amount include interest or other charges?**

○ No
◉ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

B. With regard to coins loaned to the Debtors, list the number of each type of coin loaned to the Debtors as of the date the case was filed (January, 19, 2023).

Please use only numerals and decimals in the Count fields, up to a maximum of 21 digits or 20 digits and 1 decimal.

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| 0x (ZRX) | 6681 | Livepeer (LPT) | 43.9 |
| 1inch Network (1INCH) | 57642.5 | Loopring (LRC) | 25407.7 |
| Aave (AAVE) | 108.2 | Maker (MKR) | 4.5 |
| Alchemix (ALCX) | 164.4 | Moonbeam (GLMR) | |
| Algorand (ALGO) | | Multi Collateral Dai (DAI) | 83364.5 |
| Amp (AMP) | 303893 | Near (NEAR) | |
| Ankr (ANKR) | 57349.9 | Neo (NEO) | |
| ApeCoin (APE) | 13905 | Orchid (OXT) | 2759.9 |
| Axie Infinity (AXS) | 1708.9 | PAX Gold (PAXG) | 0.8 |
| Balancer (BAL) | 441.1 | Polkadot (DOT) | |
| Bancor (BNT) | 5098.7 | Polygon (MATIC) | 222304.8 |
| Basic Attention Token (BAT) | 40940.1 | Rally (RLY) | 98377.1 |
| Binance Coin (BNB) | | Ren (REN) | 3499.3 |

Genesis Proof of Claim Form

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Bitcoin (BTC) | 100.8 | Ribbon Finance (RBN) | 173.5 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Bitcoin Cash (BCH) | 356.8 | Serum (SRM) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Bitcoin SV (BSV) | | Shiba Inu (SHIB) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Cardano (ADA) | | SKALE (SKL) | 10446 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Chainlink (LINK) | 1081.1 | Solana (SOL) | 2519.5 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Chiliz (CHZ) | 2339.2 | Stellar (XLM) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Compound (COMP) | 52.4 | Storj (STORJ) | 12732 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Cosmos (ATOM) | | SushiSwap (SUSHI) | 2808.6 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Curve DAO Token (CRV) | 45801.5 | Synthetix (SNX) | 4636.6 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Decentraland (MANA) | 15054 | Terra Classic (LUNC) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| DogeCoin (DOGE) | 654353.9 | TerraClassicUSD (USTC) | 0.1 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| EOS (EOS) | | Tether (USDT) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Ethereum (ETH) | 1217 | Tezos (XTZ) | 5101.3 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Ethereum Classic (ETC) | | The Graph (GRT) | 83227.9 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| EthereumPoW (ETHW) | | The Sandbox (SAND) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Fantom (FTM) | 186060.6 | Tokemak (TOKE) | 144.7 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Fetch.ai (FET) | 49904.4 | Tron (TRX) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Filecoin (FIL) | 37911.9 | UMA (UMA) | 45 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Flow (FLOW) | | Uniswap (UNI) | 1524.6 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Gemini Dollar (GUSD) | 7543612.1 | USD (USD) | |

Genesis Proof of Claim Form

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Helium (HNT) | | USD Coin (USDC) | 999026.6 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Horizen (ZEN) | | Wrapped Bitcoin (WBTC) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Injective (INJ) | 377.2 | Wrapped Luna (WLUNA) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Kusama (KSM) | | XRP (XRP) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Kyber Network Crystal v2 (KNC) | 1026.4 | Yearn.Finance (YFI) | 0.7 |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Litecoin (LTC) | 446 | Zcash (ZEC) | 32.5 |

| Coin List | Count |
|---|---|
| BIT (BitDAO) | |

Do you hold additional coins in your account not listed above?

○ No
◉ Yes

| Coin List | Count |
|---|---|
| See Annex (LUNA and MIR) | 0.1 |

Genesis Proof of Claim Form

## Part 2: Give Information About the Claim as of the Date the Case Was Filed

**8. What is the basis of the claim?**

> See attached Annex.

Are you a current or former Gemini Trust Company, LLC user?

- ◉ No
- ○ Yes

If yes, is your claim related to any loans you made through the Gemini Earn Program?

- ○ No
- ○ Yes

**9. Is all or part of the claim secured?**

- ◉ No
- ○ Yes. The claim is secured by a lien on property.

**Nature of property:**

- ☐ Real estate
- ☐ Motor vehicle
- ☐ Other

Describe:

> 

**Basis for perfection:**

> 

**Value of property (all amounts in US $ dollars):**

> 

**Amount of the claim that is secured (all amounts in US $ dollars):**

> 

**Amount of the claim that is unsecured (all amounts in US $ dollars):**

> 

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars):**

> 

Interest Rate Type:

- ○ Fixed
- ○ Variable

Annual Interest Rate (when case was filed) %:

> 

**10. Is this claim based on a lease?**

- ◉ No
- ○ Yes

**Amount necessary to cure any default as of the date of the petition (all amounts in US $ dollars).**

> 

**11. Is this claim subject to a right of setoff?**

- ◉ No
- ○ Yes

Identify the property. (If the property is cryptocurrency, identify each type of cryptocurrency, the respective number of units of each type of cryptocurrency, and whether the property was posted by you or the Debtor):

>

Genesis Proof of Claim Form

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

◉ No

○ Yes

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Up to $3,350 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

☐ Wages, salaries, or commissions (up to $15,150) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

☐ Other

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

◉ No

○ Yes.

Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim (all amounts in US $ dollars).

Genesis Proof of Claim Form

## Part 3: Electronic Signature

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**

**18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

- ◉ I am the creditor.
- ○ I am the creditor's attorney or authorized agent.
- ○ I am the trustee, or the Debtor, or their authorized agent. Bankruptcy Rule 3004.
- ○ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

## Executed on date (Calculated in UTC)

05/22/2023

Signature



I certify that I have completed my Proof of Claim form on the Kroll Restructuring Administration Portal. I hereby agree that my electronic signature herein complies with the ESIGN Act, and accordingly shall have the same legal effect as my original signature.

☑ I agree

**Name of the person who is completing and signing this claim:**

First Name/Middle Name/Last Name:

Tyler Meade, Esq.

Title/Company:

Acting General Counsel

Address 1:

> Gemini Trust Company, LLC

Address 2:

> 600 Third Avenue, 2nd Floor

City:

> New York

State or Province (use 2-letter abbreviation if US or Canada):

> NY

Zip Code | Postal Code:

> 10016

Is this address outside of the US?

◉ No
○ Yes

Contact phone:

> (866) 240-5113

Contact email:

> genesisclaims@gemini.com

## Supporting Documentation

**Attach Support Documentation (limited to a single PDF attachment that is less than 5 megabytes in size):**

◉ I have supporting documentation
○ I do not have supporting documentation

**Attach a single PDF attachment that is less than 5 megabytes in size**

| | |
|---|---|
| 🗋 5-22-2023 Gemini Proprietary Claim and Exhibits - Final.pdf | 3 MB |

**Attachment Filename**

> 5-22-2023 Gemini Proprietary Claim and Exhibits - Final.pdf

Confirmation of Submission

**Your Form has been successfully submitted...**

DOCUMENT ID

| 6bfd724b6c4487133fc5b83860ef267527a05a05 |

Submitted Date Time

| 2023-05-22T14:27:05.295Z |

Status

| Submitted |

CONFIRMATION ID

| 3315-61-FHKYR-019055947 |

Submission Information

When you press "Submit" you will receive an email from "noreply.efiling@ra.kroll.com." Please add this email to your allowed senders list. This email will have a PDF copy of your claim filing (with your supporting documents as a separate attachment), as well as your Confirmation ID.

## ANNEX TO PROOF OF CLAIM OF GEMINI TRUST COMPANY, LLC

By this Proof of Claim (the "Gemini Proprietary Claim"), Gemini Trust Company, LLC ("Gemini"), in its individual capacity, asserts claims against Genesis Global Capital, LLC ("GGC"), Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd. (collectively, the "Debtors") exceeding $20 million, plus certain unliquidated amounts, due and owing by GGC to Gemini as of January 19, 2023 (the "Petition Date"),[1] including but not limited to, claims for (i) amounts due under GGC's agreements with Gemini, (ii) indemnification, contribution and reimbursement, (iii) damages caused by GGC's breach of its agreements with Gemini, and (iv) damages arising from GGC's fraudulent misstatements and omissions made to induce Gemini to enter into and refrain or delay from terminating the Gemini Earn Program and the Gemini MLA (as defined below).

Gemini submits the Gemini Proprietary Claim under compulsion of the Bar Date Order.[2] Gemini is concurrently filing Gemini Master Claims, as defined in the Bar Date Order, against the Debtors on account of the Debtors' liability to the Gemini Lenders (as defined below) for the Gemini Borrowings (as defined below).

1. **Basis for Claim**. On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United

---

[1] Upon information and belief, Gemini believes that all of the Claims (as defined below) asserted by the Gemini Proprietary Claim are against GGC. Gemini does not, however, have complete knowledge and information as to the corporate relationship among all of the Debtor entities. Gemini is thus filing the Gemini Proprietary Claim against each Debtor to preserve all claims against the Debtors in the broadest fashion. Gemini reserves all rights to supplement or amend the Gemini Proprietary Claim if at any time in the future Gemini identifies any specific claims against other Debtor entities arising from or relating to Gemini Earn Program (as defined below), whether such claims arise out of contract, common law, or otherwise.

[2] The "Bar Date Order" refers to the Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief (ECF No. 200).

States Bankruptcy Court for the Southern District of New York in the jointly administered cases captioned *In re Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (the "Chapter 11 Cases").

2.      Prior to the Petition Date, GGC borrowed digital assets from certain Gemini users who elected to provide loans to GGC (the "Gemini Earn Program").  Through the Gemini Earn Program, these Gemini users (each, a "Gemini Lender")[3] agreed to lend certain of their digital assets at Gemini to GGC, under the terms of the relevant master loan agreements ("Gemini MLA")[4] among GGC, Gemini, and each Gemini Lender, in exchange for the return of such digital assets upon request or at the expiration of a specified period and the payment by GGC of loan fees and, as applicable, late fees and new tokens (collectively, the "Gemini Borrowings").

3.      On August 15, 2022, GGC entered into a security agreement (collectively, with the amendments thereto, the "Security Agreement") with Gemini, as agent for the Gemini Lenders, pursuant to which GGC pledged 30,905,782 shares of the Grayscale Bitcoin Trust ("GBTC") to secure GGC's obligations to the Gemini Lenders under the Gemini MLA (the "Gemini Collateral").  On November 7, 2022, GGC and Gemini entered into an amendment to the Security Agreement that extended its term.  On November 10, 2022, GGC, Gemini, and GGC's parent company, Digital Currency Group, Inc. ("DCG"), entered into a second amendment to the Security Agreement pursuant to which DCG agreed to deliver an additional 31,180,804 shares of GBTC

3.  From the inception of the Gemini Earn Program, more than 334,000 Gemini Lenders have loaned digital assets to GGC.  As of the Petition Date, GGC owed digital assets to approximately 232,824 Gemini Lenders.

4.  Gemini MLA refers to each master loan agreement individually and also to all of the master loan agreements collectively.  Each Gemini MLA is substantially in the same form of every other Gemini MLA, generally differing only with respect to the type of coin and number of units loaned, the duration of the loan, and the identity of the Gemini Lender.  Because of the general uniformity among each Gemini MLA, the voluminous nature of providing each Gemini MLA, and because GGC should be in possession of each Gemini MLA, one representative form Gemini MLA is annexed hereto as Exhibit A.

(the "Additional Collateral") to GGC.  GGC, in turn, agreed to transfer the Additional Collateral to Gemini for the benefit of the Gemini Lenders and Gemini, as promptly as possible following such delivery by DCG.  However, GGC breached this second amendment by failing to deliver the Additional Collateral to Gemini.

4.      On November 16, 2022, GGC announced that it was suspending redemptions by Gemini Lenders from the Gemini Earn Program.  On the same date, Gemini foreclosed on the Gemini Collateral in accordance with the terms of the Security Agreement for total proceeds of $284,333,194.40.

5.      To date, redemptions have not resumed, and Gemini Lenders continue to be denied access to the digital assets they loaned to GGC.

6.      As a result of, among other things, GGC's failure to honor its obligations to the Gemini Lenders and GGC's related breaches of its direct obligations owed to Gemini, Gemini now asserts the following claims (collectively, the "Claims") to preserve and protect its individual right to recoveries in the Chapter 11 Cases.  These Claims constitute no less than (i) all cryptocurrency coin units listed in the Gemini Proprietary Claim form and further described in Exhibit B annexed hereto (the "Listed Coins"), having an aggregate value, as of approximately 11:00 p.m. (Eastern Standard Time) on the Petition Date, of not less than **$13,541,860.54**; (ii) liquidated costs and expenses Gemini has incurred to date in an amount of no less than approximately **$6,500,000**; and (iii) unliquidated amounts, set forth below:

7.      **Agent Fees and Late Fees**.  As of the Petition Date, pursuant to Section III(a) of the Gemini MLA and Section 9 of the Gemini Earn Program Terms and Authorization Agreement (the "Terms and Authorization Agreement," Exhibit C annexed hereto), GGC owed agent fees to Gemini in digital assets in accordance with the Gemini MLA and the Terms and Authorization

Agreement.[5]   Pursuant to Section III(b), GGC owed Gemini an additional late fee of 1% (annualized, calculated daily) on such unpaid agent fees.  The Listed Coins, or the values ascribed thereto, are immediately due and payable to the Gemini Lenders.

8.     **Indemnification and Related Claims**.  Gemini has mature unliquidated contractual and non-contractual indemnity, contribution, reimbursement, equitable, and other claims against GGC for any and all losses, claims, damages, or other liabilities (or actions in respect thereof), joint or several, that Gemini or any of its affiliates, officers, directors, employees, agents, consultants or other representatives (collectively, the "Indemnified Gemini Parties") has suffered, or may suffer, arising from, based on, or relating to the Gemini Earn Program, including, without limitation, its costs and expenses related to these Chapter 11 Cases, settlement costs, investigation costs, indemnification costs, and the fees and expenses of counsel and related professionals.

9.     In addition to non-contractual indemnity, contribution, and reimbursement obligations, GGC agreed in the Gemini MLA to indemnify, defend, and hold harmless the Indemnified Gemini Parties "from and against all [liabilities, losses, costs, damages, expenses or causes of action, of whatever character, including but not limited to reasonable attorneys' fees] to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to [GGC's] breach of any of its representations, warranties or obligations set forth in [the Gemini MLA]."  MLA § XXI(b).  Gemini also has a right of contribution against GGC arising under the Securities Act of 1933.  *See, e.g.,* 15 U.S.C. § 77k(f)(1) (stating that under the Securities

---

5.   Gemini deducted agent fees associated with its services under the Gemini Earn Program from the loan fees GGC paid to each Gemini Lender in their digital assets, pursuant to the Terms and Authorization Agreement.  Gemini has confirmed, to the extent possible, that the agency fees claimed herein do not include any amounts payable to or claimed by Gemini in capacity as agent on behalf of Gemini Lenders in the Gemini Master Claim.

Act, "every person who becomes liable to make any payment under this section may recover contribution as in cases of contract from any person who, if sued separately, would have been liable to make the same payment").[6]

10.     Following GGC's breach of its obligations in the Gemini MLA and announced suspension of redemptions on November 16, 2022, these Chapter 11 Cases were initiated and dozens of claims have been asserted against Gemini and certain of the Indemnified Gemini Parties seeking, among other things, the return of the digital assets owed by GGC under the Gemini MLA and other damages relating to the Gemini Earn Program.  The Indemnified Gemini Parties are currently defending (i) four putative class-action lawsuits,[7] (ii) nine individual actions filed against Gemini in multiple fora, including state courts and arbitration tribunals,[8] and (iii) one case and multiple investigations commenced by federal and state regulators (collectively, the "Earn Actions").[9]  In addition, and included in the Earn Actions, at least fifty-nine Gemini Lenders have provided notice to Gemini that they intend to pursue claims after a contractual 60-day notice period expires.

---

7.   *See Moeller-Bertram v. Gemini Trust Company, LLC*, Case No. 23-cv-2027 (S.D.N.Y. May 15, 2023), ECF No. 29 at *3-4 (citing section 77k(f)(1), and stating "Under the federal securities laws, Defendants [Gemini]—if found liable to Plaintiff [Gemini Lenders]— would have a right of contribution as against Genesis Global Capital.").

7.   The putative class actions are as follows: (1) *Chablaney v. Gemini Trust Company, LLC, et al.*, Case No. 650076/2023 (N.Y. Sup. Ct.); (2) *Cobourn v. Gemini Trust Company, LLC*, Case No. 650567/2023 (N.Y. Sup. Ct.); (3) *Moeller-Bertram v. Gemini Trust Company, LLC, et al.*, Case No. 23-cv-2027 (S.D.N.Y.); (4) *Picha v. Gemini Trust Company, LLC*, Case No. 1:22-cv-10922 (S.D.N.Y.).

8.   The individual actions include six confidential arbitration proceedings and the three following lawsuits: (1) *Gibek v. Gemini Trust LLC*, Case No. SC-002505-22 (N.Y. Ct. Cl.); (2) *Neppl v. Gemini Trust Company, LLC*, Case No. 2022-cv-0477 (Co. El Paso Cnty. Dist. Ct.) and (3) *Rosenbaum*, Dispute Demand Notice in the Consumer Fraud Protection Bureau.  Information about the pending arbitrations is confidential, and accordingly is not filed with this Gemini Proprietary Claim.

9.   The case commenced by federal regulators is as follows: *SEC v. Genesis Global Capital, Inc., et al*, Case No. 23-cv-287 (S.D.N.Y.).

11.     Given the pendency of these Chapter 11 Cases and the Earn Actions, GGC's contractual indemnity has been triggered and GGC is required to indemnify Gemini for such liabilities that any Gemini Indemnified Party has incurred (and will incur), as well as judgments rendered or settlements entered into, in the Earn Actions.

12.     Gemini has already incurred substantial out-of-pocket costs in connection with these Chapter 11 Cases and to defend against the Earn Actions.  Gemini, on behalf of the Indemnified Gemini Parties, asserts all rights to indemnification owed to the Indemnified Gemini Parties by GGC on account of liquidated costs and expenses it has incurred to date in an amount of no less than approximately $6,500,000, all of which relates to Gemini's attorneys' fees and litigation expenses incurred in respect of these Chapter 11 Cases and the Earn Actions.  Gemini continues to participate in the Chapter 11 Cases and defend itself and the Indemnified Gemini Parties in Earn Actions, and therefore asserts a contingent, unliquidated claim for indemnification under the MLAs and other relevant law on account of any claims that are undetermined and/or unliquidated at this time but that may become determined and liquidated during the pendency of the Chapter 11 Cases, including all contingent claims that are unknown at this time, and reserves its right to amend this Gemini Proprietary Claim at its sole discretion should any such claims become determined and liquidated during the pendency of the Chapter 11 Cases.

13.     Gemini further reserves all rights to assert all claims, under contract, federal securities law, and common law, including but not limited to indemnification and contribution, against GGC with respect to all similar actions, arbitrations, demands, and investigations brought against Gemini or the Indemnified Gemini Parties at a future date.

14.     **<u>Damages Related to Fraud and Misrepresentation and Other Related Claims</u>**. Gemini has mature unliquidated claims against GGC in the nature of fraud, misrepresentation, and

related torts for any and all losses, claims, damages or other liabilities (or actions in respect thereof), joint or several, that Gemini has suffered or may suffer arising from, based on, or relating to the Gemini Earn Program, including, without limitation, settlement costs, investigation costs, the fees and expenses of counsel, and injury to Gemini's commercial reputation and goodwill.

15.    Beginning at least as early as May 2020, representatives of GGC and others acting in concert with GGC, including (without limitation) representatives of DCG, made a series of misrepresentations to Gemini relating to GGC's business practices, GGC's financial condition, GGC's financial prospects, the amount and type of financial support provided to GGC by DCG, and assurances of further support to be provided by DCG.  In addition, representatives of GGC and others acting in concert with GGC, including (without limitation) representatives of DCG, failed to disclose material information to Gemini and concealed material information from Gemini relating to the same matters.

16.    GGC and others acting in concert with GGC made those misrepresentations and material omissions knowing them to be false, recklessly with respect to their truth or falsity, and negligently with respect to their truth or falsity.  GGC and others acting in concert with GGC made those misrepresentations and material omissions with an intent to induce Gemini to enter into and refrain or delay from terminating the Gemini MLA and to enter into and refrain or delay from terminating the Gemini Earn Program.  GGC and others acting in concert with GGC also acted recklessly and negligently with respect to the risk that their statements and omissions would induce Gemini to enter into and refrain or delay from terminating the Gemini MLA and to enter into and refrain or delay from terminating the Gemini Earn Program.

17.     Gemini reasonably relied on the statements and omissions of GGC and others acting in concert with GGC in entering into and refraining or delaying from terminating the Gemini MLA and entering into and refraining or delaying from terminating the Gemini Earn Program.

18.     As a result of that reliance and of the wrongful conduct of GGC and others acting in concert with GGC, Gemini has been and will continue to be harmed.  As described above, Gemini has already incurred substantial out-of-pocket costs in these Chapter 11 Cases and to defend against the Earn Actions, which are themselves a result of Gemini's entry into and continued participation in the Gemini Earn Program.  Gemini has incurred liquidated costs and expenses to date in an amount of no less than approximately $6,500,000, all of which relates to Gemini's attorneys' fees and litigation expenses incurred in the Chapter 11 Cases and the Earn Actions, and Gemini continues to incur additional costs and expenses in the Chapter 11 Cases and in defending itself in Earn Actions.  In addition, Gemini has incurred significant damages, in an unliquidated amount, resulting from injury to Gemini's business reputation and goodwill following GGC's breach of its obligations in the MLA and suspension of redemptions on November 16, 2022, all of which is a result of Gemini's entry into and continued participation in the Gemini Earn Program.

19.     GGC has also been unjustly enriched at Gemini's expense by virtue of the aforementioned conduct and by virtue of its retention of the Additional Collateral provided to it by DCG for the benefit of Gemini and the Gemini Lenders.  As a result of GGC's participation in the Gemini Earn Program, GGC gained access to the digital assets loaned to GGC and the Additional Collateral, while exposing Gemini to all of the harms described above resulting from GGC's wrongful conduct.

20.     Gemini thus asserts all claims against GGC, under both federal and state law, for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation, unjust enrichment, breach of implied duty of good faith and fair dealing, and any related legal theory with respect to GGC's statements, omissions, and conduct (and the statements, omissions, and conduct of other parties for which GGC is liable on the basis of conspiracy, aiding-and-abetting, or any other basis for vicarious liability, including (without limitation) DCG) in connection with Gemini's entry into and performance under the Gemini MLA and Gemini's entry into and continued participation in the Gemini Earn Program.  Gemini also asserts any and all equitable claims against GGC arising from the aforementioned conduct.

21.     To the extent that further investigation or discovery provides the basis for further claims against GGC in connection with Gemini's entry into and performance under the Gemini MLA or Gemini's entry into and continued participation in the Gemini Earn Program, Gemini hereby reserves all such rights to assert such claims against GGC, under federal and state law.

22.     **The Security Agreement**.  As of the Petition Date, GGC was liable to Gemini in an unliquidated amount for damages for breach of the Security Agreement, including, without limitation, GGC's failure to deliver the Additional Collateral to Gemini for the benefit of the Gemini Lenders and Gemini, including, without limitation, all appreciation in value of the Additional Collateral since GGC's failure to deliver occurred.

23.     Had GGC complied with its contractual obligation to deliver the Additional Collateral, Gemini would have foreclosed on such Additional Collateral and would have had sufficient funds to satisfy a significant portion of the amounts owed to the Gemini Lenders prior to the Petition Date.  This breach of the Security Agreement has caused Gemini damages, expenses

(including legal and other professional fees and disbursements) and other losses, both known and yet to be discovered, in an unliquidated amount.

24.     **Other Claims**.  As of the Petition Date, the Debtors, because of their continuing failure to honor obligations due and owing to the Gemini Lenders, are absolutely and unconditionally indebted to the Gemini for any and all:  (i) other amounts due or to become due to Gemini, in its individual capacity, with respect to, arising from, or in connection with the Security Agreement, the Gemini MLA, the Gemini Earn Program, and all agreements related thereto, including, without limitation, the Terms and Authorization Agreement, on any basis, in law or in equity, whether now due or hereafter arising; and (ii) damages for breach of any covenant, representation, warranty, or other provision of the Gemini MLA or such related agreements.  The total of such other amounts cannot, at this time, be reasonably calculated or estimated, and Gemini does not waive any rights with respect to such amounts by not stating a specific figure therefor at this time.

25.     **Reservation of Rights and Amendments**.  Gemini reserves all rights to assert that all or a portion of the Claims asserted in the Gemini Proprietary Claim are entitled to administrative priority under Sections 503 and 507 of the Bankruptcy Code.  The Gemini Proprietary Claim is filed without prejudice to the right of Gemini to request payment of any administrative expense claims that Gemini may have against the Debtors (including, without limitation, administrative expense claims arising from GGC's use, if any, of the Gemini Borrowings and the Additional Collateral after the Petition Date).  Gemini reserves the right to request payment of such administrative expenses at a later date or as required by the Court, the Bankruptcy Code, or other applicable law.  Gemini reserves the right to set off any amount, cryptocurrency, or other positions

owed by Gemini to GGC against any obligation of GGC to Gemini on an individual basis, in each case to the extent allowed by applicable law or any agreement or instrument.

26.     In addition to the Gemini Proprietary Claim and other claims to be asserted referenced herein, Gemini reserves the right to file any requests for payment or other Proof(s) of Claim.  By filing this Proprietary Claim, Gemini does not waive, and hereby expressly reserves, any and all rights Gemini may have on its own behalf with respect to the cash, cryptocurrencies, or other assets GGC owes to Gemini, including without limitation the Additional Collateral.

27.     The assertion of Claims herein is not a concession or admission as to the correct characterization or treatment of any such Claims.  Specifically, Gemini's execution and filing of the Gemini Proprietary Claim does not constitute: (a) waiver or release of Gemini's rights against any other entity or person liable for all or part of the Claims; (b) consent by Gemini to the jurisdiction of this Court with respect to any proceeding commenced against or otherwise involving Gemini; (c) consent by Gemini to the treatment of any non-core claim against any of them as a core claim; (d) waiver of the right to move to withdraw the reference with respect to the subject matter of the Claims or otherwise; (e) waiver of any right to the subordination, in favor of Gemini, of indebtedness or liens held by other creditors of the Debtors; (f) an election of remedies that waives or otherwise affects any other remedies; or (g) waiver of any right to arbitration or other alternative dispute resolution mechanism that is otherwise applicable.

28.     In addition to the Gemini MLA, the Terms and Authorization Agreement, and the Security Agreement, the Debtors have copies of the agreements referred to herein and information relevant to the Claims described herein.  Consequently, additional copies of such documents are not included with this Annex to the Gemini Proprietary Claim.  Gemini will furnish the Debtors with copies of any additional pertinent documentation upon request.

29.     Gemini expressly reserves its right to amend and supplement this Gemini Proprietary Claim to the fullest extent permitted by law, including, without limitation, to specify (and quantify) damages, costs, expenses, and other charges or claims incurred by the Gemini in connection with the recovery of the Gemini Borrowings or otherwise and to file additional proofs of claim for such additional claims, including, without limitation:  (i) claims for post-petition interest, legal fees, and related expenses that are not ascertainable at this time; and (ii) claims arising from or relating to the avoidance of transfers made to Gemini, any Gemini Lender, or any other entity.

30.     Gemini's reconciliation process related to agent fees, late fees, and other items owed to Gemini is ongoing.  Gemini reserves the right to amend the Gemini Proprietary Claim and this Annex consistent with the results of such reconciliation.

31.     **Notices**.  All notices and communications with respect to this Gemini Proprietary Claim should be sent to:

> Anson B. Frelinghuysen, Esq.
> Jeffrey S. Margolin, Esq.
> Hughes Hubbard & Reed LLP
> One Battery Park Plaza
> New York, New York 10004
> Telephone: (212) 837-6000
> Facsimile:  (212) 422-4726
> Email: anson.frelinghuysen@hugheshubbard.com
>        jeff.margolin@hugheshubbard.com

**EXHIBIT A**

## MASTER DIGITAL ASSET LOAN AGREEMENT

This Master Digital Asset Loan Agreement ("Agreement") is made on this [date of Lender onboarding] by and between Genesis Global Capital, LLC ("Genesis" or "Borrower"), a corporation organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 Gemini Trust Company, LLC ("Gemini" or "Custodian") a trust company organized and existing under the laws of the State of New York with its principal place of business at 315 Park Avenue South, 18th Floor, New York, NY 10010, acting as the authorized agent of a customer of Custodian which accepts the terms of this Agreement and direct Custodian to lend their assets hereunder (the "Lender" and, together with Genesis and Gemini, the "Parties").

## RECITALS

**WHEREAS**, Gemini serves as custodian of Digital Assets for Lender, and Lender have appointed Gemini as its agent to facilitate Loans of its Digital Assets;

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Custodian will facilitate the lending of Digital Assets on behalf of Lender to Borrower, and Borrower will pay a Loan Fee and return such Digital Assets to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Asset lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties hereby agree as follows:

I. **Definitions**

"**Airdrop**" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "**Applicable Airdrop**" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Asset held at a specified time. A "**Non-Applicable Airdrop**" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Asset, or a distribution that depends on a wallet of the relevant Digital Asset meeting a threshold requirement.

"**Borrower**" means Genesis Global Capital, LLC.

"**Borrower Email**" means lend@genesiscap.co.

"**Business Day**" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"***Call Option***" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"***Digital Asset***" means Digital Asset that the Borrower includes in any Offered Loan Terms, and that is available for trading on the Gemini Exchange.

"***Digital Asset Address***" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Asset.

"***Fixed Term Loan***" means a Loan with a pre-determined Maturity Date.

"***Gemini Earn Platform***" means a service and accompanying user interface offered by Custodian whereby a Lender may authorize Custodian, as custodian of Lender's Digital Assets, to negotiate one or more loan agreements on the Lender's behalf for the purpose of lending certain of Lender's Digital Assets to one or more borrowers at Lender's direction.

"***Hard Fork***" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"***Loan***" means a loan of Digital Assets made pursuant to and in accordance with this Agreement.

"***Loan Balance***" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees and Late Fees, and for a particular Loan, as defined in Section III.

"***Loaned Assets***" means any Digital Asset amount transferred in a Loan hereunder until such Digital Asset (or identical Digital Asset) is transferred back to Lender hereunder, except that, if any new or different Digital Asset is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Asset shall be deemed to become Loaned Assets in addition to the former Digital Asset for which such exchange is made.  For purposes of return of Loaned Assets by Borrower or purchase or sale of Digital Currencies pursuant to Section X, such term shall include Digital Asset of the same quantity and type as the Digital Asset, as adjusted pursuant to the preceding sentence.

"***Maturity Date***" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"***Open Term Loan***" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"***Term***" means the period from the date Loaned Assets are delivered to Borrower through the date such Loan's Loaned Assets are repaid in full.

## II.   **General Loan Terms.**

### (a) Offers of Loans to Lender

Custodian will provide to Lender on the Gemini Earn Platform the current terms on which Borrower has offered to enter into Loans (the "Offered Loan Terms"), which shall be delivered by Borrower to Custodian. Offered Loan Terms may include the types of Digital Assets which the Borrower will borrow, the rates and Loan types of such Digital Assets it will borrow, and maximum amounts it will borrow from all lenders on the Gemini Earn Platform. Custodian will promptly update the Gemini Earn Platform to reflect any change in the Offered Loan Terms communicated by Borrower to Custodian. For the avoidance of doubt, no erroneous or contrary information provided by Custodian to Lender, whether on the Gemini Earn Platform or otherwise, shall obligate Borrower to enter into Loans on terms other than those specified in the Offered Loan Terms then in effect.

### (b) Loan Procedure

During the Term of this Agreement, on any Business Day Lender may direct Custodian, via the Gemini Earn Platform to notify Borrower on its behalf for each Digital Asset and Loan type listed in the applicable Offered Loan Terms whether it will lend additional Digital Assets at the current Loan Fee or whether it requests a return of Digital Assets (if applicable). For any Digital Assets Lender will lend, it shall deliver such Digital Assets according to the time and manner specified, and to a Digital Asset Address provided by, Custodian. For any Digital Assets Lender requests to be returned, Borrower shall return such Digital Assets within three Business Days to a Digital Asset Address provided by Custodian.  Upon receipt of the Loaned Assets, Custodian shall include a record of the Loan, including all the terms of the Loan, in a log of all Lender's Loans accessible to Lender and Borrower.

### (c) Loan Repayment Procedure

Loans will be Open Term Loans unless otherwise specified. For Open Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian within three Business Days after the request by Lender pursuant to Section II(b) above. For Fixed Term Loans, the Loaned Assets shall be repaid to a Digital Asset Address provided by Custodian at the time indicated in the Offered Loan Terms, unless Borrower and Lender agree to extend the Fixed Term Loan for another Fixed Term Loan under the then-current Offered Loan Terms, or an Open Term Loan.  If Custodian has not provided to Borrower a Digital Asset Address for receiving the repayment of a Loan by 5:00 p.m. New York time on the day prior to the earlier of the Maturity Date or the Recall Delivery Day (defined below), then such Loan will become an Open Term Loan on said Maturity Date or Recall Delivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Recall Delivery Day.

Custodian shall notify Borrower to the extent Custodian determines in its sole discretion that it shall no longer support custody, trading or ancillary services for a particular Digital Asset.  The date of such notice will be deemed the Recall Request Day for any Loan Balance comprised of such Digital Assets.

3

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

      (i)      the Maturity Date;

      (ii)     for an Open Term Loan, the repayment of the Loan Balance by Borrower prior to the Maturity Date;

      (iii)    the occurrence of an Event of Default as defined in Section VIII; however, Lender, or Custodian on behalf of Lender, shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

      (iv)    in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

In the event of a termination of a Loan, any Loaned Assets
shall be redelivered immediately to a Digital Asset Address provided by Custodian and any fees or owed shall be payable by Borrower immediately to a Digital Asset Address provided by Custodian. In the event of a termination of a Loan pursuant to Section II(d)(iv), Borrower shall pay an additional Loan Fee until (i) the end of the then-current monthly loan period or (ii) the Maturity Date of such Loan (whichever is shorter) at the then-current interest rate on the amount of the Loan terminated.

(e) <u>Redelivery in an Illiquid Market</u>

If Gemini and each of the three other highest-volume Digital Asset exchanges that report prices for the applicable Digital Asset (as measured by the 30-day average daily trading volume of the applicable Digital Asset on the Loan Date) (these such exchanges, the "<u>Liquidity Exchanges</u>") cease or suspend trading as of in the Loaned Assets on the Maturity Date or the Recall Delivery Day, whichever applicable, Borrower and Custodian will engage in good faith negotiations to reach agreement on a substitute form of repayment for the affected loans or to otherwise temporarily suspend the requirement for Borrower to return the Loaned Assets, and such negotiation shall be binding on Lender.

**III.**     **Loan Fees and Transaction Fees.**

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as set forth in the Offered Loan Terms. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Assets are transferred to Borrower to the date on which such Loaned Assets are repaid in their entirety to Lender.

Unless otherwise specified in the Offered Loan Terms, (i) Loan Fees shall be based on a monthly interest rate, which may be updated on the first day of each calendar month upon at least five (5) days advance notice by Borrower to Custodian; (ii) no minimum amount of Loaned Assets shall be required for a Loan to accrue a Loan Fee; (iii) Loan Fees shall be calculated using the "daily balance method", meaning the applicable monthly interest rate shall be applied to the principal and interest that has accrued on the Loaned Assets each day; (iv) Loan Fees shall at all times be greater than 0% APY; and (v) Loan Fees shall be paid monthly by Borrower to a Digital Asset Address provided by Custodian as agent for Lender.  Upon receipt, Custodian shall be solely responsible for paying Loan Fees to Lenders, and Lender will have no recourse to Borrower for such Loan Fees.

Borrower shall calculate any Loan Fees (which may be aggregated across all outstanding Loans from Lender) owed on a daily basis and provide Custodian with the calculation, and information relied upon to support the calculation, upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Assets. If Custodian believes any Loan Fee was calculated in error, Custodian shall present its own Loan Fee calculation and the Borrower and Custodian shall cooperate in good faith to decide a mutually agreeable calculation. The calculation of any Loan Fees accepted by Custodian shall be final and binding upon Lender.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Assets.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any accrued but unpaid Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) promptly following the end of the calendar month in which the Loan was outstanding, but in any even no later than three (3) Business Days after the end of such month or (ii) the termination of all Loans hereunder (the "Payment Due Date").   The Loan Fee and Late Fees shall be payable, unless otherwise agreed by the Borrower and Lender in writing, in the same Loaned Assets that were borrowed, on the same blockchain and of the same type that was loaned by the Lender during the Loan.

## IV.    **Hard Fork**

(a) <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Custodian, in behalf of Lender, may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Custodian to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Asset to Custodian and Custodian transfers said Digital Asset back to Borrower pursuant to this section.

(b) <u>Lender's Right to New Tokens</u>

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Asset protocol or an Applicable Airdrop (such tokens that meet the following conditions, the "New Tokens") if the following two conditions are met:
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the Digital Asset market capitalization and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender.  If sending the New Tokens to Lender is burdensome in Borrower's reasonable discretion, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate reasonably selected by Borrower at the time of repayment, or (ii) returning the borrowed Digital Asset so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above.  Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this

Section V shall continue for any New Tokens that meet the criteria in this subsection (b) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

**V.** **Representations and Warranties.**

The Parties hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Assets or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account unless it expressly specifies otherwise in writing and complies with Section VI.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of Loaned Assets and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Each Party represents and warrants that it has all necessary governmental and other consents, approvals and licenses to perform its obligations hereunder.

7

(i) Each Party represents and warrants that it has made its own independent decisions to enter into any Loan and as to whether the Loan is appropriate or proper for it based upon its own judgement and upon advice from such advisers (other than another Party) as it has deemed necessary. It is not relying on any communication (written or oral) of the other Parties as investment advice or as a recommendation to enter into any Loan, it being understood that information and explanations related to the terms and conditions of a Loan will not be considered investment advice or a recommendation to enter into that Loan.

(j) Each Party represents and warrants that it is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts, the terms, conditions and risks of any Loan. It is also capable of assuming, and assumes, the risks of that Loan. The other Parties are not acting as a fiduciary for or an adviser to it in respect of any Loan.

(k) Lender represents and warrants that it has, or will have at the time of the transfer of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(l) Lender represents and warrants that the Loaned Assets have not been or will not be obtained, directly or indirectly, from or using the assets of any: (i) "employee benefit plan" as defined in Section 3(3) of the U.S. Employee Retirement Income Security Act of 1974 which is subject to Part 4 of Subtitle B of Title I of such Act; (ii) any "plan" as defined in Section 4975(e)(1) of the U.S. Internal Revenue Code of 1986; or (iii) any entity the assets of which are deemed to be assets of any such "employee benefit plan" or "plan" by reason of the U.S. Department of Labor's plan asset regulation, Title 29 of the Code of Federal Regulations, Section 2510.3-101.

(m) Lender represents and warrants that it is in compliance with applicable laws and regulations, except where Lender's failure to so comply would not have a material effect on Borrower.

(n) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(o) Borrower has furnished to Lender, or will furnish to Lender within seven (7) Business Days after demand by Lender, its most recent statement required to be furnished to customers pursuant to Rule 17a-5(c) under the Securities Exchange Act of 1934.

(p) Custodian represents and warrants that it has been duly authorized by Lender to (i) enter into this Agreement and the Loans contemplated by this Agreement; and (ii) perform the obligations set forth herein on behalf of Lender.

**I.        Appointment of Custodian as Agent**

a.  Borrower and Custodian agree to execute and comply fully with the provisions of Exhibit A (the terms and conditions of which Exhibit are incorporated herein and made a part hereof).

b.  Lender represents, which representation shall continue during the term of this Agreement and any Loan hereunder, that it:
    (i)   has received and reviewed a copy of this Agreement;
    (ii)  has duly appointed Custodian as its agent to act on Lender's behalf for all purposes under this Agreement;
    (iii) has duly authorized Custodian to enter into the Loans contemplated by the Agreement on its behalf and to perform the obligations of Lender under such Loans;
    (iv)  is a Principal referred to in Exhibit A and will be liable as principal with respect to Loans entered into by Custodian on its behalf and its related obligations hereunder; and
    (v)   has taken all necessary action to authorize such appointment of Custodian and such performance by it.

c.  Custodian represents and warrants that it is in compliance with applicable laws and regulations, except where Custodian's failure to so comply would not have a material effect on the other Parties.

d.  Lender agrees and acknowledges that Borrower's delivery to Custodian of any Loaned Assets in accordance with the terms of this Agreement and Exhibit A will fully discharge Borrower's obligations with respect to such Loaned Assets and that, thereafter, Custodian will be the only Party to which Lender may have recourse for such Loaned Assets. Subject to the terms of the Gemini Earn Platform and any other applicable agreements between Lender and Custodian, Custodian agrees to promptly deliver to Lender all Loaned Assets so received from Borrower.

**VI.      Default**

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have two Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens in accordance with Section V, however, Borrower shall have three Business Days to cure such default;

(c) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including

9

without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(d) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(e) any representation or warranty made by either Party in this Agreement that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

(f) any representation or warranty of Custodian in Exhibit A proves to be incorrect or untrue in any material respect as of the date of making thereof or during the term of any Loan, or Custodian shall fail to perform in any material respect Custodian's covenants in Exhibit A, which shall be deemed an Event of Default by Lender, provided, however, Custodian shall have ten Business Days to cure such default.

## VII.   Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Custodian acting on behalf of the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Custodian's operating account to hold on behalf of itself and the Lender, to the extent necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a) or (b), persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(c) or (d), the Custodian acting on behalf of the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender or Custodian, the Borrower may, at its option  exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Section VII (e) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (c) or (d), the Borrower may, at its option, terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

**VIII.   Rights and Remedies Cumulative.**

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

**IX.   Survival of Rights and Remedies**

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets, and termination of this Agreement.

**X.   Governing Law; Dispute Resolution.**

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

**XI.   Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XII, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a

11

Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.  Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement.  Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XII.  Notices.

Any notices or right exercisable by Lender(s) hereunder may also be exercised by Custodian in its capacity as authorized agent for Lender(s). Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Custodian, as authorized agent for Lender:
Gemini Trust Company, LLC
315 Park Avenue South, 18th Floor
New York, NY 10010
Attn: Gemini Earn
Email: legal@gemini.com

Borrower:
Genesis Global Capital, LLC

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: General Counsel
Email: legal@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIII.   **Modifications.**

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XIV.   **Single Agreement**

The Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other. Accordingly, the Parties hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted. In addition, the Parties acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

### XV.   **Entire Agreement.**

This Agreement, each exhibit referenced herein, and all applicable Offered Loan Terms constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements. Nothing in this Section XVII shall be construed to conflict with or negate Section XV above.

### XVI.   **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that no Party may assign this Agreement or any rights or duties hereunder without the prior written consent of each of Custodian and Borrower. Notwithstanding the foregoing, in the event of a change of control of Custodian or Borrower, prior written consent shall not be required so long as such Party provides the other Party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party. Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in

13

any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVII.  Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XVIII. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XIX.  Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationships of Borrower, Custodian and Lender.

## XX.  No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXI.  Indemnification.

(a) *By Custodian*. Custodian hereby agrees to indemnify, defend and hold harmless Borrower, its affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all liabilities, losses, costs, damages, expenses or causes of action, of whatever character, including but not limited to

reasonable attorneys' fees (collectively, "Liabilities"), to the extent arising out of or relating to any pending or threatened claim, action, proceeding or suit (each, a "Claim") by any third party based on, arising out of or relating to Custodian breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Custodian's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower in any material respect of its obligations under this Agreement.

(b) *By Borrower*. Borrower hereby agrees to indemnify, defend and hold harmless Lender, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Borrower's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Borrower's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Lender or Custodian in any material respect of their obligations under this Agreement.

(c) *By Lender*. Lender hereby agrees to indemnify, defend and hold harmless Borrower, Custodian, and their respective affiliates and any of their respective officers, directors, employees, agents, consultants or other representatives from and against all Liabilities, to the extent arising out of or relating to any Claim by any third party based on, arising out of or relating to Lender's breach of any of its representations, warranties or obligations set forth in this Agreement; provided, however, Lender's obligation to provide such indemnity will not apply to the extent that such Liabilities are incurred as a result of the breach by Borrower or Custodian in any material respect of their obligations under this Agreement.

## XXII.  Term and Termination.

This Agreement may be terminated by any Party by providing thirty days' written notice to the other Parties.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIII. Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

**I.**     <u>**Intent.**</u>

Each Party agrees that the Loans are intended to be commercial loans of Digital Assets and not securities under the U.S. federal or state securities laws.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:


By: _____
Name:
Title:

CUSTODIAN:

GEMINI TRUST COMPANY, LLC


By: _____
Name:
Title:

BORROWER:

GENESIS GLOBAL CAPITAL, LLC


By: _____
Name: Kristopher Johnson
Title: Senior Risk Officer

17

## EXHIBIT A

### Gemini Trust Company, LLC Acting as Agent

This Exhibit sets forth the terms and conditions governing all Loans in which Gemini Trust Company, LLC is acting as agent ("Agent") for a third party ("Principal"). Unless otherwise defined, capitalized terms used but not defined in this Exhibit shall have the meanings assigned in the Master Digital Asset Loan Agreement of which it forms a part (such agreement, together with all exhibits thereto, the "Agreement").

1.  **Additional Representations, Warranties and Covenants.** In addition to the representations and warranties set forth in the Agreement, Agent hereby makes the following representations, warranties and covenants, which shall continue during the term of any Loan:

    (a) Principal (i) acknowledged electronically or in writing receiving a counterpart of the Agreement, (ii) has duly authorized Agent  to deliver Digital Assets comprising any Loaned Assets for the Loans contemplated by the Agreement and to perform the obligations of Lender under such Loans, and (iii) has taken all necessary action to authorize such execution and delivery by Agent and such performance by it;

    (b) Principal has specifically directed Agent, through the Gemini Earn Platform, to deliver Digital Assets comprising any Loaned Assets for each Loan and to request the return of any Loaned Assets, and has not authorized Agent to exercise discretion in the determining the amount, timing or selection of any Loan on Principal's behalf;

    (c) Agent will provide in a timely manner with a written confirmation or other notification of each Loan and, upon a Principal's request, promptly provide Principal with any records of the Loans made on its behalf;

    (d) Agent will provide Principal with a statement, at least quarterly, containing a description of all lending activity on Principal's behalf during the preceding period, including all Loans made on behalf of Principal, all Digital Assets returned and Loan Fees paid to Principal (net fees and expenses charged to Principal), and the amount of Loans outstanding at the beginning and end of the period; and

    (e) Agent will assist Borrower in obtaining from Principal such information regarding Principal as Borrower may reasonably request; provided, however, that Agent shall not have any obligation to provide Borrower with confidential information regarding Principal.

2.  **Identification of Principal.** Agent agrees to provide Borrower, prior to any Loan under the Agreement, with the ability to access the name of the specific Principal for which it will act as Agent under the Agreement. If Agent fails to provide access to the identify of such Principal prior to any Loan under the Agreement,, or Borrower shall determine in its reasonable discretion that any Principal identified by Agent is not acceptable to it, Borrower may reject and rescind any Loan with such Principal, return to Agent any Loaned Assets previously transferred to Borrower and refuse any further performance under such Loan;

provided, however, that (A) Borrower shall promptly (and in any event within one Business Day of notice of the specific Principal) notify Agent of its determination to reject and rescind such Loan and (B) to the extent that any performance was rendered by Lender under any Loan rejected by Borrower, Lender shall remain entitled to any fees or other amounts that would have been payable to it with respect to such performance if such Loan had not been rejected.

3. **Netting of Deliveries.** On each Business Day, at such times and in such manner as may be mutually agreed by Agent and Borrower, Agent will sum together the aggregate amount of each Digital Asset to be delivered to Borrower, and subtract therefrom the aggregate amount of such Digital Asset to be delivered by Borrower to Agent, in each case on behalf of Agent's Principals in accordance with the Agreement (the "**Net Settlement Amount**"). If the Net Settlement Amount for a Digital Asset is: (i) positive, Agent will deliver the Net Settlement Amount of such Digital Asset to Borrower or, (ii) negative, Borrower will deliver the Net Settlement Amount to Agent, in each case in accordance with the Agreement. Upon delivery of the Net Settlement Amount, Borrower and each Principal shall be fully discharged from liability for the obligations, if any, corresponding to such Net Settlement Amount and Agent shall be solely responsible and liable for delivering to each Principal the amount of such Digital Asset to which such Principal is entitled to under the Agreement.

4. **Limitation of Agent's Liability.** The Parties expressly acknowledge that if the representations and warranties of Agent under the Agreement, including this Exhibit, are true and correct in all material respects during the term of any Loan and Agent otherwise complies with the provisions of this Exhibit, then:

(a) Agent's obligations under the Agreement shall not include a guarantee of performance by its Principal;

(b) Borrower's remedies shall not include a right of setoff against obligations, if any, of Agent arising in other transactions in which Agent is acting as principal; and

(c) Following an Event of Default by Borrower, the Principal to the Loan(s) subject to such Event of Default may proceed directly as Lender against Borrower and not be obligated to join Agent or any other Principal as a condition precedent to initiating such proceeding.

**4. Interpretation of Terms.** All references to "Lender" or "Borrower," as the case may be, in the Agreement shall, subject to the provisions of this Exhibit (including, among other provisions, the limitations on Agent's liability in Section 3 of this Exhibit), be construed to reflect that (i) Principal shall have, in connection with any Loan or Loans entered into by Agent on its behalf, the rights, responsibilities, privileges and obligations of a "Lender" directly entering into such Loan or Loans with Borrower under the Agreement, and (ii) Principal has designated Agent as its sole agent for performance of Lender's obligations to Borrower and for receipt of performance by Borrower of its obligations to Lender in connection with any Loan or Loans under the Agreement (including, among other things, as Agent for Principal in connection with transfers of Loaned Assets and as agent for giving and receiving all notices under the Agreement). Both Agent and its Principal shall be deemed "Parties" to the Agreement and all

19

references to a "Party" or "either Party" in the Agreement shall be deemed revised accordingly (and any Default by Agent under the Agreement shall be deemed a Default by Lender).

**EXHIBIT B**

**LISTED COINS***

| Coin List | Count |
|---|---|
| 1inch Network (1INCH) | 57,642.49692684310 |
| Aave (AAVE) | 108.16729403990 |
| Alchemix (ALCX) | 164.3733431536910 |
| Amp (AMP) | 303,893.0039141710 |
| Ankr (ANKR) | 57,349.8630886610 |
| ApeCoin (APE) | 13,904.96178419040 |
| Axie Infinity (AXS) | 1,708.859385615920 |
| Balancer (BAL) | 441.1475074844440 |
| Basic Attention Token (BAT) | 40,940.1000645780 |
| Bitcoin Cash (BCH) | 356.7735716787550 |
| Bancor (BNT) | 5,098.704598875550 |
| Bitcoin (BTC) | 100.7938234282910 |
| Chiliz (CHZ) | 2,339.209038684220 |
| Compound (COMP) | 52.39176831413070 |
| Curve DAO Token (CRV) | 45,801.52537185120 |
| Multi Collateral Dai (DAI) | 83,364.53002012460 |
| DogeCoin (DOGE) | 654,353.8815231350 |
| Ethereum (ETH) | 1,216.947440848440 |
| Fetch.ai (FET) | 49,904.35523413650 |
| Filecoin (FIL) | 37,911.84544439840 |
| Fantom (FTM) | 186,060.6298688480 |
| The Graph (GRT) | 83,227.91796651510 |
| Gemini Dollar (GUSD) | 7,543,612.124923330 |
| Injective (INJ) | 377.2349889825630 |
| Kyber Network Crystal v2 (KNC) | 1,026.405359821380 |
| Chainlink (LINK) | 1,081.135826778480 |
| Livepeer (LPT) | 43.90726555491520 |
| Loopring (LRC) | 25,407.7241867630 |
| Litecoin (LTC) | 445.9620572659250 |
| LUNA** | 0.0000000010 |
| Decentraland (MANA) | 15,053.95422916670 |
| Polygon (MATIC) | 222,304.7508694110 |
| MIR** | 0.0000000010 |
| Maker (MKR) | 4.497317008865920 |
| Orchid (OXT) | 2,759.896060916160 |
| PAX Gold (PAXG) | 0.7952695099792960 |
| Ribbon Finance (RBN) | 173.4766779363250 |

\* The Listed Coins are subject to Gemini's ongoing reconciliation.  Gemini reserves the right to amend the Listed Coins.

\*\* Coins constituting the "Other" category on Proof of Claim Form Section 7(b).

| Coin List | Count |
|---|---|
| Ren (REN) | 3,499.268820710270 |
| Rally (RLY) | 98,377.10019865570 |
| SKALE (SKL) | 10,445.96171889140 |
| Synthetix (SNX) | 4,636.604109693640 |
| Solana (SOL) | 2,519.503427707640 |
| Storj (STORJ) | 12,731.97811874560 |
| SushiSwap (SUSHI) | 2,808.606921195720 |
| Tokemak (TOKE) | 144.7308848398090 |
| UMA (UMA) | 44.97613873729830 |
| Uniswap (UNI) | 1,524.627860320360 |
| USD Coin (USDC) | 999,026.5546154650 |
| TerraClassicUSD (USTC) | 0.0000000010 |
| Tezos (XTZ) | 5,101.303691819870 |
| Yearn.Finance (YFI) | 0.7362091179301310 |
| Zcash (ZEC) | 32.50197130945060 |
| 0x (ZRX) | 6,680.957051581210 |

**EXHIBIT C**

# Gemini Earn Program Terms and Authorization Agreement

Last updated: December 14, 2022

---

Gemini Earn (the "Program") is a program that allows customers ("you" or "your") of Gemini Trust Company, LLC ("Gemini," "we," "us" or "our") to lend certain Digital Assets that you custody with us. In order to participate in the Program, you must agree to this Terms of Service and Authorization Agreement ("Authorization Agreement") and enter into one or more Master Loan Agreements ("Loan Agreements") with the borrowers disclosed on Schedule A ("Borrowers"). By choosing to participate in our Program, you acknowledge that you have read, understood and agreed to this Authorization Agreement.

## 1. PROGRAM RISKS

- YOUR AVAILABLE DIGITAL ASSETS WILL LEAVE OUR CUSTODY, AND YOU ACCEPT THE RISK OF LOSS ASSOCIATED WITH LOAN TRANSACTIONS, UP TO, AND INCLUDING, TOTAL LOSS OF YOUR AVAILABLE DIGITAL ASSETS.
    - We are not a depository institution, and our Program does not offer a depository account. Participating in our Program may put your Digital Assets at risk.
    - Loans made through our Program may not be secured. As a Lender, you understand that you have exposure to Borrower credit risk. Borrowers are not required to post collateral to you or to us, however, they may require collateral to secure loans that they themselves make.

- Transactions in Digital Assets may carry added risk compared to lending of other types of assets because transactions in cryptocurrency are in many cases irreversible. Funds may not be recoverable in the event of errors or fraudulent activity.
- We are not a principal to any Loan, and we have no obligation or ability to return the Loaned Digital Assets from your Borrower in the event of a Borrower default.
- The Borrower is not required to custody or maintain the Loaned Digital Assets with us or any other Gemini-controlled account. You understand that we cannot be and are not responsible for any Digital Assets once they leave our custody.
- You understand that Loans are not insured by us or any governmental program or institution and that we do not assume any market or investment risk of loss associated with your Participation in our Program. Your Available Digital Assets may decline in value during the term of a Loan or the applicable callback period.
- Loan Fees are variable and subject to change. Loan Fees may decline over time and we cannot guarantee that you will earn any particular rate of return on your Available Digital Assets by making Loans.
- You are responsible for determining any taxes you may owe as a result of your participation in our Program. You should consult a tax advisor if you have questions about the tax implications of our Program or any other digital asset transactions.

## 2. Participation in our Program

By participating in our Program, you represent and affirm that you are at least 18 years old, have the legal capacity to enter into this Authorization Agreement, and agree to be legally bound by the terms and conditions of this Authorization Agreement in their entirety.

You agree and understand that this Authorization Agreement is subject to the terms and conditions set forth in our User Agreement, which also govern this Authorization Agreement. In case of conflict, the User Agreement shall control. You further agree and understand that the defined terms used in this

Authorization Agreement, if defined in our User Agreement, shall have the meanings set forth in our User Agreement.

You agree and understand that we may change this Authorization Agreement from time to time. Your continued participation in the Program following any change or update shall constitute your agreement to the amended Authorization Agreement, and you agree to be legally bound by its terms and conditions as amended. You should, therefore, read this Authorization Agreement from time to time. You further agree and understand that we have the right to require your affirmative assent and continuing acceptance of this Authorization Agreement, from time to time, as a condition of your use of the Program. If you do not agree to be bound by this Authorization Agreement, you should not and cannot participate in the Program.

## 3. Appointment of Gemini as Your Agent

You hereby appoint and authorize Gemini as your agent to transfer on your behalf Digital Assets which you own and designate as available for lending by using the "Earn" function of the Program user interface, or that you otherwise transfer into our Program, and are listed as supported by the Program on Schedule B (in each case, "Available Digital Assets"), to Borrowers in accordance with the terms of this Agreement. We shall have the responsibility and authority to do or cause to be done all acts we shall determine to be desirable, necessary, or appropriate to implement and administer your authorization to lend Available Digital Assets through our Program. You acknowledge and agree that we are acting as a fully disclosed agent and not as principal in connection with the lending of your Available Digital Assets through our Program.

All lending by you through our Program will be on an unsecured basis. We will not collect or hold collateral from Borrowers, nor maintain any collateral account for your benefit.

We may, but are not required to, maintain a "liquidity reserve" on your behalf of up to thirty percent (30%) of your Available Digital Assets ("Reserve") in order to more quickly fund your Loan callback and withdrawal requests. We may maintain a Reserve by withholding any amount of Available Digital Assets you designate for a Loan. You appoint and authorize Gemini to adjust such Reserve from time to time based on demand and activity in the Program, number of available Borrowers, or any other criteria set by us in our reasonable discretion. Available Digital Assets that we hold as your Reserve will not be provided to a Borrower in any Loan, and will not accrue Loan Fees. We will exclude any Reserve, if applicable, from the calculation or the interest rate and/or other Loan Fees presented to you at the time a Loan is made. A Reserve is not collateral and will not be reinvested on your behalf.

## 4. Digital Asset Loan Agreements

In order to participate in our Program, you must enter into one or more Loan Agreements with Borrowers which set forth the terms for loans of your Available Digital Assets ("Loans"). We will present you with each available Loan Agreement for your electronic signature through the Program user interface. You are ultimately responsible for your adherence to the terms of a Loan Agreement, and you should review the terms carefully before you make any Loans.
Certain terms of individual Loans, such as the Loan's interest rate and term, may be negotiated at the time a Loan is made. You will be required to acknowledge the terms of each Loan electronically before we may disburse your Available Digital Assets to a Borrower.

## 5. Making Loans to Borrowers

Borrowers are your sole counterparty in our Program. You authorize us, upon your instruction through our Program user interface, to effect Loans with any Borrower with whom you have acknowledged and entered into a Loan Agreement. We shall

not be responsible for any statements, representations, warranties, or covenants made by any Borrower in connection with any Loan or for any Borrower's performance of or failure to perform the terms of any Loan under the applicable Loan Agreement or any related agreement, including the failure to return any borrowed Digital Assets to you or to make any required payments to you.

We shall be responsible for determining whether any Loan shall be made, and for negotiating and establishing the terms of each such Loan within the parameters identified by you and the applicable Loan Agreement. We shall have the authority to terminate any Loan in our discretion, at any time and without prior notice to you. In the event of a default (within the meaning of the applicable Loan Agreement) by a Borrower on any Loan, we shall be entitled to exercise any rights and remedies on your behalf with respect thereto, and will be fully protected in acting in any manner it deems reasonable and appropriate. Upon notice to us, you have the right to direct us to initiate action to terminate any Loan made under this Authorization Agreement in accordance with the terms of the Loan Agreement.

You acknowledge that we administer our Program for other customers of Gemini. We will allocate digital asset lending opportunities among our customers, using methods established by us from time to time. We do not represent or warrant that any amount or percentage of your Available Digital Assets will in fact be loaned to Borrowers. You acknowledge and agree that you shall have no claim against Gemini and we shall have no liability arising from, based on, or relating to, loans allocated to other customers, the terms of loans negotiated for other customers, or loan opportunities not made available to you, whether or not we have made fewer or more loans for any other customer, and whether or not any loan allocated to another customer, or loan opportunity not made available to you, could have resulted in Loans made under this Authorization Agreement.

You further acknowledge and agree that, under the applicable Loan Agreements, Borrowers will not be required to return any Available Digital Assets delivered as a Loan ("Loaned Digital Assets") immediately upon receipt of notice from us terminating the applicable Loan, but instead will be required to return such Loaned

Digital Assets within such period of time following such notice as is specified in the applicable Loan Agreement, but not later than the customary settlement period.

## 6. Transfer of Information to Borrowers

In order to borrow your Available Digital Assets and pay Loan Fees to you, Borrowers, their affiliates or their respective service providers may require certain identifying information from you. You authorize us to share with Borrowers your Gemini account information and personally identifying information hereunder solely for the purposes of facilitating Loans and paying Loan Fees to you. This information may include, but is not limited to, your name, date of birth, and state and country of residence. Borrowers may store, access, transfer or use your personal information differently than we do. You should review each of your Borrowers' privacy policies to familiarize yourself with their terms. If you do not wish to share personally identifying information with Borrowers, you should not participate in our Program.

## 7. Distributions, Staking and Voting Rights with Respect to Loaned Digital Assets

Forks and Airdrops on Loaned Digital Assets and Available Digital Assets are subject to our User Agreement. In the event of a Fork or Airdrop, we may terminate or call back affected Loans on your behalf. If we, in our sole discretion, determine to support a Forked Network during the term of a Loan, and the distribution of new tokens can be definitively calculated according to the distribution method, you will receive the benefit and ownership of any incremental tokens generated as a result of the Fork or Airdrop (such tokens that meet the following conditions, the "New Tokens") if the following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day

following the occurrence the Fork or Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Digital Assets (defined as the total value of the Loaned Digital Assets) (calculated as a 30-day average on such date).

- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Fork or Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Digital Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the Digital Asset market capitalization and 24-hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, Gemini shall mutually agree upon another data source with the Borrower).

If the above criteria are met, New Tokens will be delivered to you according to the procedures set forth in the applicable Loan Agreement. We are not responsible for notifying you of any upcoming or planned Fork, Airdrop, or any other distributions on your Loaned Digital Assets. You acknowledge that the tax treatment of any payments of distributions from a Borrower to you in substitution of receiving such distribution directly may differ, and that you are solely responsible for calculating any resulting tax liabilities.

You acknowledge that you will not be entitled to participate in any staking functionality, delegation, voting, or other governance functions with respect to Digital Assets that are transferred into our Program or have been delivered to a Borrower in connection with a Loan.

# 8. Loan Fees

(a) Loan Fees. Fees or other income received from a Borrower in connection with Loans ("Loan Fees") shall be regularly credited to your Program account, on a recurring basis established by us, after deducting any applicable payments to Gemini as compensation for its services under this Authorization Agreement as

set forth below. Then-current Loan Fees will be provided through the Program user interface for your review and approval before you authorize a new Loan. Unless otherwise specified by the Loan Agreement, Loan Fees will be paid in-kind, in the form of the Loaned Digital Asset. Any taxes required to be withheld at source from Loan Fees may be deducted from the amount credited to your Program account as described in this Paragraph (a), and to the extent that such amount is less than the amount of such taxes, then you shall be responsible for any shortfall.

(b) Notice of Rate Changes. Certain Loan Fees, including interest rates, may be variable and subject to change during the term of a Loan according to the Loan Agreement. As a result, your Loan Fees may increase or decrease from month to month, leading to a higher or lower rate of return on your Loaned Digital Assets. Borrowers participating in the Program will update their interest rates no more than once every thirty (30) days. We will notify you through the Program website and/or user interface of the available interest rates for each Available Digital Asset in the applicable month.

(c) Right to Debit or Set Off. We may at any time charge or debit any of your accounts maintained by or on behalf of Gemini in any capacity (or set off any amounts otherwise payable or creditable to any such account) to pay any amounts due to us under this Authorization Agreement. You acknowledge that whenever we exercise our rights under this Paragraph (b) with respect to your obligations to Gemini, we are acting in a principal capacity on our own behalf and not on your behalf.

(d) Rewards and Promotions. We may from time to time offer rewards, referral fees or promotional credits that are expressed in our Program user interface as higher Loan Fees for an Available Digital Assets ("Rewards"). Unless otherwise noted, Rewards are not offered to you by any Borrower and may be modified or terminated in our sole discretion at any time. You are responsible for any tax reporting obligation arising from Rewards credited to your Program account.

# 9. Agent Fees

The fees associated with our services under our Program are disclosed at https://www.gemini.com/fees/gemini-earn-fees ("Agent Fees"), which we will deduct from Loan Fees as described in Section 8. Agent Fees may be changed from time to time by us upon notice to you by email or through the Program user interface. By continuing to participate in our Program following such change, you acknowledge and agree to such updated Agent Fees.

# 10. Additional Program Terms and Conditions

*General*. Your participation in our Program shall at all times be subject to our User Agreement. While there is currently no minimum amount of Available Digital Assets required to participate in our Program, we may, in our sole discretion, require a minimum balance in the future.

*Calling Back Loans*. The terms of each Loan will be set forth in the Loan Agreement with the Borrower, and your rights and obligations as a lender under these agreements may vary. However, we will require that all Borrowers agree that Loans will be callable at any time unless otherwise agreed with our customers. As a result, you may request a return, in whole or in part, of your loaned Available Digital Assets at any time.

Once you request a return of your Available Digital Assets through our Program user interface, you will generally receive these Digital Assets within five (5) business days. However, repayment terms are set forth in the Loan Agreement and the terms of your Loan Agreement may provide for a longer repayment period. While Available Digital Assets are in the process of being returned, they will not be available for trading, transfers or withdrawals. Withdrawals from our Program to external addresses are subject to additional verification by us. While withdrawals from our Program to your Gemini Account are currently free and unlimited, we

reserve the right to limit the frequency of withdrawals and/or charge an administrative fee in the future.

*Borrower Capacity.* We do not guarantee that a Borrower will seek a Loan for your Available Digital Assets on terms you find acceptable, or at all. If at any time the Available Digital Assets in our Program exceed Loan demand from Borrowers, lending opportunities will be allocated according to methods established by us from time to time. We may, but are not required to, maintain a waitlist if Borrower capacity is oversubscribed. A waitlist is not a guarantee that your Available Digital Assets will be Loaned to a Borrower.

*Delisting; Regulatory Changes.* Unless otherwise agreed between you and the Borrower, Loans are generally open-term and will continue earning Loan Fees until called back by you. However, your Loan Agreement may specify certain events that allow the Borrower to repay and terminate a Loan immediately: such as a good faith belief that holding or borrowing an Available Digital Asset could violate applicable law. Similarly, we may terminate any outstanding Loans if we determine to delist a loaned Digital Asset from our Exchange. Review your Loan Agreement(s) for details on when and how Loans may be terminated.

# 11. Standard of Care and Indemnification

We shall use reasonable care in the performance of our duties hereunder consistent with that exercised by custodians generally in the performance of duties arising from acting as agent for clients in asset lending transactions. You agree to indemnify us and hold us harmless from any loss or liability (including the reasonable fees and disbursements of counsel) incurred by us in rendering services hereunder or in connection with any breach of the terms of this Authorization Agreement, except such loss or liability which results from our gross negligence or willful misconduct.

 Notwithstanding any express provision to the contrary herein, we shall not be liable for any indirect, consequential, incidental, special, punitive or exemplary

damages, even if we have been apprised of the likelihood of such damages occurring.

You acknowledge that in the event that your participation in our Program generates income, we may be required to withhold tax or may claim such tax from you as is appropriate in accordance with applicable law.

## 12. Representations and Warranties

Each party hereto represents and warrants that (a) it has and will have the legal right, power and authority to execute and deliver this Authorization Agreement, to enter into the transactions contemplated hereby, and to perform its obligations hereunder; (b) it has taken all necessary action to authorize such execution, delivery, and performance; (c) this Authorization Agreement constitutes a legal, valid, and binding obligation enforceable against it; and (d) the execution, delivery, and performance by it of this Authorization Agreement will at all times comply with all applicable laws and regulations.

You represent and warrant that (a) you are in compliance with our User Agreement, (b) you have made your own determination as to (and you acknowledge that we are making no representation or warranty as to) the tax and accounting treatment of any Loan, including any Loan Fees or other remuneration or other funds received with respect thereto; (c) you are the legal and beneficial owner of (or exercise complete discretion over) all Available Digital Assets free and clear of all liens, claims, security interests and encumbrances; and (d) all transactions you authorize through our Program are carried out for your own account and not on behalf of any other person or entity.

## 13. Borrower Default

We act as your authorized agent under this Authorization Agreement with respect to facilitating your Loans to Borrowers. However, your Available Digital Assets leave our custody during the term of a Loan and the applicable callback period. The loan of Available Digital Assets to a Borrower cannot be reversed by us at our own discretion or our customer's direction. We do not insure, indemnify, or otherwise guarantee the return of your Digital Assets that have been loaned to a Borrower.

Your counterparty in each Loan transaction is a Borrower, and you alone bear the risk of loss of your loaned Digital Assets principal should a Borrower default. Your remedies in the event of a Borrower default will be determined by the applicable Loan Agreement. These remedies may be limited or, in some cases, unavailable in the event of a Borrower default. We shall be entitled to exercise any rights and remedies under the Loan Agreement on your behalf, and will be fully protected in acting in any manner we deem reasonable and appropriate. If the Borrower does not return the Loaned Digital Assets, it may not be possible to recover the assets from the Borrower, and we shall have no obligation to pursue such recovery on your behalf.

## 14. Continuing Agreement; Termination; Remedies

It is the intention of the parties hereto that this Authorization Agreement shall constitute a continuing agreement in every respect and shall apply to each and every Loan, whether now existing or hereafter made. We may terminate this Authorization Agreement immediately if (a) we, in our sole discretion, determine to suspend or terminate our Program; (b) we, in our sole discretion, determine that you have violated any portion of our User Agreement; or (c) upon the default of you or any Borrower under the terms of an applicable Loan Agreement. Following such termination, no further Loans shall be made hereunder on your behalf, and we shall, within a reasonable time after termination of this Authorization

Agreement, terminate any and all outstanding Loans. The provisions hereof shall continue in full force and effect in all other respects until all Loans have been terminated and all obligations satisfied as herein provided.

You may also end your participation in our Program at any time by requesting a return of all of your Available Digital Assets to your Gemini Account; provided, however, that this Authorization Agreement shall continue in full force and effect.

## 15. Agents and Subcontractors

We may use such agents, including sub-custodians, third party custodians and our affiliates, as we deem appropriate to carry out our duties under this Authorization Agreement. Our sole liability for the acts or omissions of any agent shall be limited to liability arising from our failure to use reasonable care in the selection of such agent.

## 16. Force Majeure

We shall not be responsible for any losses, costs, or damages suffered by you resulting directly or indirectly from war, riot, revolution, terrorism, pandemic, acts of government or other causes beyond our reasonable control or apprehension.

## 17. Miscellaneous

This Authorization Agreement supersedes any other agreement between you and Gemini or any representations made by you or Gemini to each other, whether oral or in writing, concerning Loans. This Authorization Agreement shall not be assigned by you without our prior written consent. Subject to the foregoing, this Agreement shall be binding upon, and shall inure to the benefit of, the parties hereto and their respective heirs, representatives, successors, and permitted

assigns. This Authorization Agreement shall be governed and construed in accordance with the laws of The State of New York.

## 18. Dispute Resolution

You and Gemini agree and understand that any controversy, claim, or dispute arising out of or relating to this Authorization Agreement or your relationship with Gemini — past, present, or future — shall be settled solely and exclusively by binding arbitration held in the county in which you reside, or another mutually agreeable location, including remotely by way of video conference administered by National Arbitration and Mediation ("NAM") and conducted in English, rather than in court. You and Gemini expressly agree that any dispute about the scope of this Authorization Agreement to arbitrate and/or the arbitrability of any particular dispute shall be resolved in arbitration in accordance with this section. You and Gemini expressly agree that an arbitrator may issue all appropriate declaratory and injunctive relief necessary to ensure the arbitration of disputes (but only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim). You and Gemini agree to keep any arbitration strictly confidential.

You and Gemini agree that this arbitration provision applies not just to disputes between you and Gemini but also to (a) disputes with Gemini and any other party named or added as a co-defendant along with Gemini at any time, and (b) disputes in which a party is named as a defendant involving claim(s) arising from or related to this Authorization Agreement, even if Gemini is not named or added as a defendant. Any such co-defendant or defendant is a third-party beneficiary entitled to enforce this arbitration provision.

You and Gemini agree that the arbitrator shall have the authority to order any remedies, legal or equitable, which a party could obtain from a court of competent jurisdiction in an individual case based on the claims asserted, and nothing more.

The arbitrator shall not award punitive or exemplary damages to either party, unless such remedies would otherwise be available under applicable law. You and Gemini agree that this arbitration provision evidences a transaction involving interstate commerce and that the Federal Arbitration Act, 9 U.S.C. s. 1 et seq. ("FAA"), will govern its interpretation and enforcement and proceedings pursuant thereto. It is the intent of the parties to be bound by the provisions of the FAA for all purposes, including, but not limited to, interpretation, implementation, enforcement, and administration of this arbitration provision, and the FAA shall preempt all state laws to the fullest extent permitted by the law. You and Gemini agree that good-faith, informal efforts to resolve disputes often can result in a prompt, low-cost and mutually beneficial outcome. Therefore, a party who intends to seek arbitration must first send to the other a written Notice of Dispute ("Dispute Notice"). Any Dispute Notice to Gemini must be sent to support@gemini.com ("Notice Address"). Any Dispute Notice to you by Gemini will be sent to the email address registered with your Gemini Account. Any Dispute Notice must include (a) the name, address, and email address of the party providing the Dispute Notice; (b) a description of the nature and basis of the claim or dispute, including any relevant facts regarding Gemini or your use of Gemini; (c) an explanation of the specific relief sought, including the total damages sought, if any, and the basis for the damage calculations; (d) a signed statement from the party providing the Dispute Notice verifying the accuracy of the contents of the Dispute Notice; and (e) if the dispute is from you, and you have retained an attorney, a signed statement from you authorizing Gemini to disclose your account details to your attorney if necessary in resolving your claim or dispute. Any Dispute Notice from you must be individualized, meaning it can only concern your dispute and no other person's dispute. And any Dispute Notice from Gemini must be individualized, meaning it can only concern you and no other person. You also agree that, after sending a Demand Notice to Gemini, at Gemini's request you will personally participate in a discussion by telephone with Gemini to discuss whether an agreement can be reached to resolve the claim before arbitration is initiated. If

you are represented by counsel, you agree that you will personally attend the telephone conference with your counsel. Gemini also agrees to participate in such a telephone discussion at your request. Any informal dispute resolution conferences shall be individualized, such that a separate conference must be held each time either party intends to commence individual arbitration; multiple individuals initiating claims cannot participate in the same informal telephonic dispute resolution conference, unless mutually agreed to by the parties. You agree that compliance with these informal dispute resolution procedures is a condition precedent to commencing arbitration, and that the arbitrator shall dismiss any arbitration filed without fully and completely complying with these informal dispute resolution procedures.

If you and Gemini do not reach an agreement to resolve a claim within 60 days after a Demand Notice is received, you or Gemini may commence an arbitration proceeding; except that, if either you or Gemini send the other an incomplete Dispute Notice, the 60-day period begins only after a complete Dispute Notice is received, and if either you or Gemini request a telephone discussion, the 60-day period begins only after the discussion has occurred. The statute of limitations and any filing fee deadlines shall be tolled while the parties engage in these informal dispute resolution procedures.

Should any dispute proceed to arbitration, you and Gemini agree that any such arbitration shall be conducted in accordance with the prevailing NAM rules and procedures (including Comprehensive Dispute Resolution Rules and Procedures and/or the Supplemental Rules for Mass Arbitration Filings, as applicable) ("NAM Rules"), with the following exceptions to the NAM Rules if in conflict:

- The arbitration shall be conducted by one neutral arbitrator;
- Each side agrees to bear its own attorney's fees, costs, and expenses, unless such remedies would otherwise be available under applicable law, or unless the arbitrator finds that a claim, counterclaim, or defense is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)); and

- All pleadings submitted in arbitration are subject to the standards set forth in Federal Rule of Civil Procedure 11, which, among other things, permits sanctions to be imposed where pleadings are submitted for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.
- The arbitrator may issue orders (including subpoenas to third parties, to the extent permitted by law) allowing the parties to conduct discovery sufficient to allow each party to prepare that party's claims and/or defenses, taking into consideration that arbitration is designed to be a speedy and efficient method for resolving disputes. For example, the arbitrator shall apply the Apex Doctrine and preclude depositions of either party's current or former high-level officers absent a showing that the officer has unique, personal knowledge of discoverable information and less burdensome discovery methods have been exhausted.

Additionally, if, at any time, 25 or more similar demands for arbitration are asserted against either party or their related parties by the same or coordinated counsel or entities ("Mass Filing"), the additional protocols set forth below shall apply:

- NAM's Mass Filing Rules shall apply if the parties' dispute is deemed by NAM, in its sole discretion pursuant to the NAM Rules and this Dispute Resolution section, to be part of a Mass Filing.
- Any Mass Filing shall be subject to a bellwether proceeding intended to reach a fair and speedy resolution of all claims included in the Mass Filing. In any Mass Filing, NAM shall select 15 demands for arbitration to proceed ("Bellwether Arbitrations"). While the Bellwether Arbitrations are adjudicated, no other demand for arbitration that is part of the Mass Filings may be filed, processed, or adjudicated, and no filing fees for such a demand for arbitration shall be due from either party to the administrator. Any applicable statute of limitations regarding such a demand for arbitration shall remain tolled beginning when the Mass Filing claimant first provided the other party with its Dispute Notice, as defined above.
- Following the resolution of the Bellwether Arbitrations, the parties shall engage in a global mediation of all remaining demands for arbitration comprising the Mass Filing. The mediation shall be administered by NAM. If the parties are unable to resolve the remaining demands for arbitration comprising the Mass Filing within 30 days following the mediation, the

remaining demands for arbitration comprising the Mass Filing shall be administered by NAM on an individual basis pursuant to the NAM Rules. You and Gemini agree to abide by all decisions and awards rendered in such proceedings and you and Gemini agree that such decisions and awards rendered by the arbitrator shall be final and conclusive, except for any appeal rights under the FAA.

To the extent you or Gemini seek emergency relief in connection with any controversy, claim, or dispute arising out of or relating to this Authorization Agreement or the breach thereof, or your relationship with Gemini, you and Gemini agree that this Authorization Agreement restricts you or Gemini from seeking emergency relief from any court, including without limitation temporary restraining orders and/or preliminary injunctions, and you and Gemini agree that, to the extent either party breaches this Authorization Agreement by seeking such relief from a court, that party shall be responsible for paying the opposing party's attorneys' fees in opposing such relief, and the arbitrator shall render an award of such attorneys' fees at the earliest possible time after such fees are incurred. Notwithstanding the foregoing obligation to settle disputes through arbitration, you or Gemini may assert claims, if they qualify, in small claims (or an equivalent) court in New York County or any United States county where you live. However, if the claims are transferred, removed or appealed to a different court, they shall be subject to arbitration.

You and Gemini agree that you or Gemini may, without inconsistency with this arbitration provision, apply to any court for an order enforcing the arbitral award. You and Gemini irrevocably and unconditionally agree to waive any objection that you or Gemini may now or hereafter have to the laying of venue of any action or proceeding relating to enforcement of the arbitral award in the federal or state courts located in the State of New York.

You and Gemini agree that all such controversies, claims, or disputes shall be settled in this manner in lieu of any action at law or equity. In arbitration the parties waive their rights to have a jury trial.

IF FOR ANY REASON THIS ARBITRATION CLAUSE BECOMES NOT APPLICABLE OR FOR ANY OTHER REASON LITIGATION PROCEEDS IN COURT THEN THE PARTIES AGREE THAT YOU AND GEMINI:

- TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAWS AND REGULATIONS, HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY AS TO ANY ISSUE RELATING HERETO IN ANY ACTION, PROCEEDING, OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AUTHORIZATION AGREEMENT OR THE SERVICES THAT GEMINI PROVIDES OR ANY OTHER MATTER INVOLVING US HERETO, AND
- SUBMIT TO THE EXCLUSIVE JURISDICTION AND VENUE OF THE FEDERAL OR STATE COURTS LOCATED IN NEW YORK COUNTY, NEW YORK AND YOU AGREE NOT TO INSTITUTE ANY SUCH ACTION OR PROCEEDING IN ANY OTHER COURT IN ANY OTHER JURISDICTION.

You and Gemini agree to arbitrate solely on an individual basis, and agree and understand that this Authorization Agreement does not permit class action or private attorney general litigation or arbitration of any claims brought as a plaintiff or class member in any class or representative arbitration proceeding or litigation ("Representative and Class Action Waiver"). The arbitral or other tribunal may not consolidate more than one person or entity's claims and may not otherwise preside over any form of a representative or class proceeding. Nothing in this paragraph shall be construed to prohibit settlements on a class-wide or representative basis.

If any portion of this arbitration clause is held to be invalid or unenforceable, the remaining portions will nevertheless remain in force. In any case in which (1) the dispute is filed as a class or representative action and (2) there is a final judicial determination that all or part of the Representative and Class Action Waiver is unenforceable, the class and/or representative action to that extent must be litigated in a civil court of competent jurisdiction, but the portion of the Representative and Class Action Waiver that is enforceable shall be enforced in arbitration. Additionally, if a court determines that a public injunctive relief claim may proceed notwithstanding the Representative and Class Action Waiver, and that determination is not reversed on appeal, then the public injunctive relief claim

will be decided by a court after any individual claims are arbitrated, and the parties will ask the court to stay the public injunctive relief claim until the other claims have been finally concluded in arbitration.

You agree that this section of this Authorization Agreement has been included to rapidly and inexpensively resolve any disputes with respect to the matters described herein, and that this section shall be grounds for stay or dismissal of any court action commenced by you with respect to a dispute arising out of such matters.

# 19. Modification

We reserve the right to update this Authorization Agreement from time to time, including the Schedules attached hereto, and will notify you of material updates via email or through our Program user interface. Your continued participation in our Program indicates your acceptance to the Authorization Agreement, as updated.

Notwithstanding the forgoing, you acknowledge and agree that we may increase the number of Digital Assets supported in the Program on Schedule B at any time and without notice to you.

# Schedule A

## Approved Borrowers

Genesis Global Capital, LLC

# Schedule B

## Digital Assets Supported by the Program

1Inch (1INCH)

Aave (AAVE)

Alchemix (ALCX)

Flexacoin (AMP)

Ankr (ANKR)

ApeCoin (APE)

Axie Infinity (AXS)

Balancer (BAL)

Basic Attention Token (BAT)

Bitcoin Cash (BCH)

Bancor (BNT)

Bitcoin (BTC)

Chiliz (CHZ)

Compound (COMP)

Curve (CRV)

Dai (DAI)

Dogecoin (DOGE)

Ether (ETH)

Fetch.ai (FET)

Filecoin (FIL)

Fantom (FTM)

The Graph (GRT)

Gemini dollar (GUSD)

Injective Protocol (INJ)

Kyber Network (KNC)

Chainlink (LINK)

Livepeer (LPT)

Loopring (LRC)

Litecoin (LTC)

Decentraland (MANA)

Polygon (MATIC)

Maker (MKR)

Orchid (OXT)

PaxGold (PAXG)

Ribbon Finance (RBN)

Ren (REN)

Rally (RLY)

Skale (SKL)

Synthetix (SNX)

Solana (SOL)

Storj (STORJ)

Sushiswap (SUSHI)

Tokemak (TOKE)

Uma (UMA)

Uniswap (UNI)

USD Coin (USDC)

Tezos (XTZ)

Yearn.finance (YFI)

Zcash (ZEC)

0x (ZRX)