**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

GEMINI TRUST COMPANY, LLC,

*Plaintiff*,

v.

DIGITAL CURRENCY GROUP, INC. and
BARRY SILBERT,

*Defendants*.

Civil Action No. 1:23-cv-06864

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**WILLKIE FARR & GALLAGHER LLP**
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000

**JFB LEGAL, PLLC**
299 Broadway – Suite 1816
New York, NY 10007
(212) 548-3212

*Attorneys for Gemini Trust Company, LLC*

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Background .................................................................................................................. 4

    A.  DCG And Genesis's Lending Business ....................................................... 4

    B.  Genesis's 3AC Losses .................................................................................. 5

    C.  Defendants' Scheme To Mislead Gemini And Genesis's Depositors About Genesis's Financial Condition ................................................................... 6

    D.  Silbert Intervenes To Induce Gemini To Continue The Earn Program ........ 7

    E.  Genesis Suspension Of Withdrawals And Bankruptcy ................................ 8

    F.  Procedural History ...................................................................................... 8

Argument .................................................................................................................... 8

    I.  Count I States A Claim For Fraud ................................................................. 8

        A.  The Complaint Validly Alleges That Defendants Conspired With Genesis To Defraud Gemini .................................................................... 8

            1.  The Complaint Plausibly Alleges The Existence Of An Unlawful Agreement.... 10

            2.  The Complaint Alleges Multiple Overt Acts In Furtherance Of The Conspiracy ......................................................................... 17

            3.  The Complaint's Fraud Allegations Are Not Improperly Duplicative ................. 17

        B.  The Complaint Alleges That Defendants Made Fraudulent Misstatements To Gemini With The Requisite Scienter ...................................................... 18

            1.  Silbert Made Affirmatively False And Materially Misleading Statements Directly To Gemini ........................................................... 19

            2.  The Complaint's Factual Allegations Raise A Strong Inference Of Scienter ...... 20

        C.  The Complaint Alleges Actionable Damages And Causation .................................... 21

    II.  Count II States A Claim For Defendants' Aiding And Abetting Of Genesis's Fraud...... 23

        A.  The Complaint Validly Alleges Actual Knowledge Of Genesis's Fraud ................... 23

        B.  The Complaint Validly Alleges That Defendants Affirmatively Assisted Genesis's Fraud......................................................................... 24

        C.  The Complaint Validly Alleges That Defendants Proximately Caused Gemini's Injuries ........................................................................ 24

    III.  In All Events, Leave To Amend Should Be Granted If Any Portion Of The Complaint Is Dismissed ................................................................. 25

Conclusion ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ........................................................................................................14

*Chemtex, LLC v. St. Anthony Enters., Inc.*,
    490 F. Supp. 2d 536 (S.D.N.Y. 2007) ...........................................................................24

*Cofacredit, S.A. v. Windsor Plumbing Supply Co.*,
    187 F.3d 229 (2d Cir. 1999) ...........................................................................................10

*Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*,
    No. 15-CV-2044 (AJN), 2016 U.S. Dist. LEXIS 5441 (S.D.N.Y. Jan. 15, 2016) .................22

*Hotaling v. A. B. Leach & Co.*,
    159 N.E. 870 (N.Y. 1928) ...............................................................................................22

*IKB Int'l S.A. v. Bank of Am. Corp.*,
    584 F. App'x 26 (2d Cir. 2014) ......................................................................................20

*Kashi v. Gratsos*,
    790 F.2d 1050 (2d Cir. 1986) .....................................................................................9, 18

*In re Platinum-Beechwood Litig.*,
    427 F. Supp. 3d 395 (S.D.N.Y. 2019) ......................................................................17, 18

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
    89 F. Supp. 3d 602 (S.D.N.Y. 2015) ..............................................................................20

*Rutkin v. Reinfeld*,
    229 F.2d 248 (2d Cir. 1956) .............................................................................................9

*Schlick v. Penn-Dixie Cement Corp.*,
    507 F.2d 374 (2d Cir. 1974) ...........................................................................................14

*Stern v. Leucadia Nat'l Corp.*,
    844 F.2d 997 (2d Cir. 1988) ...........................................................................................14

*Vtech Holdings Ltd. v. PricewaterhouseCoopers LLP*,
    348 F. Supp. 2d 255 (S.D.N.Y. 2004) ............................................................................19

**Other Authorities**

Restatement (Second) of Torts § 529 ............................................................................19

Restatement (Second) of Torts § 548A cmt. b ..............................................................22

Plaintiff Gemini Trust Company, LLC (Gemini) respectfully submits this opposition to the motion to dismiss Gemini's Amended Complaint filed by Defendants Digital Currency Group, Inc. (DCG) and Barry Silbert.

## INTRODUCTION

This is a straightforward case of fraud. DCG and Silbert (DCG's founder and CEO) had a choice to make in June 2022 when DCG's non-party subsidiary Genesis Global Capital, LLC (Genesis) faced crushing losses as a result of its reckless lending to a Singapore-based hedge fund called Three Arrows Capital (3AC). When 3AC imploded, Genesis lost an astonishing $1.2 billion, and it was left insolvent by more than $1 billion. DCG could have let Genesis fail, acknowledging that crushing insolvency and pursuing an orderly unwinding of Genesis's lending and borrowing business. Alternatively, DCG could have provided the financial support that Genesis needed to regain solvency and honor its obligations to its depositors, including hundreds of thousands of Gemini users for whom Gemini acted as custodian and agent.

But DCG and Silbert did not select either of those options. Instead, they conspired with Genesis to falsely represent Genesis's financial position, in order to fraudulently induce Genesis's depositors to continue to lend huge amounts of cryptocurrency and U.S. Dollars, and to dissuade Gemini from terminating the Gemini Earn program under which its users lent to Genesis. The core of the scheme was a fraudulent promissory note issued to Genesis (the DCG Promissory Note), which Silbert himself executed on DCG's behalf. The DCG Promissory Note was tailor-made to allow DCG to *pretend* that it had addressed Genesis's crippling losses, because its face value was $1.1 billion. But in fact the DCG Promissory Note was (and is) worth only a small fraction of that amount on a present-value basis, given its interest rate of just one percent and ten-year maturity. As part of the fraudulent scheme, Gemini and Genesis's depositors were repeatedly told that DCG had stepped in to absorb the 3AC losses and that Genesis was well-capitalized to continue its

business. But that was absolutely false. The DCG Promissory Note offset only a small fraction of the 3AC losses, and Genesis remained insolvent by hundreds of millions of dollars.

Defendants worked in concert with Genesis to conceal the DCG Promissory Note's existence and terms, and to hide Genesis's insolvency. Gemini and Genesis's depositors received financial reports that falsely presented the DCG Promissory Note's value and mischaracterized it as a current asset, even though it would not come due for ten years. High-level DCG executives repeatedly supported Genesis's efforts to mislead, including at a personal meeting that Defendant Silbert arranged with one of Gemini's founders in October 2022. In a desperate bid to delay termination of the Gemini Earn program, Silbert falsely claimed that Genesis faced only a short-term liquidity mismatch. In fact Genesis was deeply insolvent, as Silbert well knew. In short, Defendants and Genesis lied over and over again, to keep the revenue flowing and to prevent depositors from withdrawing capital from Genesis.

But Defendants could delay Genesis's day of reckoning only until November 2022, at which point Genesis refused to honor its obligations to depositors and suspended withdrawals of cryptocurrency. Genesis ultimately filed for Chapter 11 bankruptcy protection in January 2023. Since Genesis's suspension of withdrawals, Gemini has faced dozens of claims from users seeking the return of their digital assets and other damages relating to the Gemini Earn program—all as a result of Defendants' campaign of fraud, which was intended to and did dissuade Gemini from terminating the Earn program at a time when Gemini could have assured the timely return of its users' assets.

In their motion to dismiss, Defendants pretend that they were strangers to this situation—and that they had nothing to do with Genesis's fraud. But as we explain in detail below, that position cannot be squared with the Complaint's well-pled factual allegations. Those allegations

make clear that Defendants played a critical role in the fraud. Indeed, the basic nature of the DCG Promissory Note confirms Defendants' participation in an unlawful agreement to defraud, because it is a transaction that would make sense only if it could be concealed from Gemini and Genesis's creditors. Defendants' repeated misrepresentations to Gemini and other Genesis depositors likewise confirm that Defendants were part of the scheme. And the facts alleged amply support a conclusion that Defendants knowingly engaged in the fraud. In short, there is no merit to Defendants' motion to dismiss, and it should accordingly be denied.

In any case, recent events have overtaken Defendants' strained arguments. Just yesterday, the New York Attorney General filed a complaint charging Defendants (among others) with multiple claims of fraud arising from the scheme to misrepresent Genesis's financial condition.[1] Apparently based on discovery from Defendants' internal files that has never been available to Gemini, the Attorney General's complaint alleges in great detail Defendants' active participation in the fraud, including specific allegations that Defendants fraudulently misled Gemini about Genesis's financial situation. *See* Ex. A ¶ 123-79. In contrast to Defendants' (incredible) argument that they played no role in Genesis's false statements, the Attorney General's complaint alleges that DCG engaged with Genesis "in a communications campaign designed to conceal Genesis Capital's financial condition and mislead counterparties into believing Genesis Capital was operating 'business as usual,'" and that "[t]hose counterparties included Gemini, which conducted ongoing due diligence on behalf of the Earn investors." *Id.* ¶ 123. The New York Attorney General alleges, for example, that DCG's Chief Operating Officer and Head of Communications helped to draft misleading Twitter posts about the support DCG provided to Genesis, and that Silbert reviewed certain of those posts before they were made. *Id.* ¶¶ 132-33, 151-52; *see also* Compl.

---

[1] A copy of the Attorney General's complaint is attached as Exhibit A.

¶¶ 41, 43 (Gemini's allegations about the same false Twitter posts). High-level DCG executives worked on talking points that Genesis used to mislead its counterparties, including Gemini, about DCG's financial support. Ex. A ¶¶ 157-59; *see also* Compl. ¶¶ 63-64 (Gemini's allegations about a July 6, 2022, call with Genesis personnel who relied on these false talking points). And DCG personnel coordinated with Genesis to withhold financial reports that would have revealed the ongoing fraud. Ex. A ¶ 174*; see also* Compl. ¶¶ 68-82 (Gemini's allegations about the false financial reports that Genesis shared with Gemini in order to conceal Genesis's financial condition).

To be sure, the Attorney General's allegations do not appear in Gemini's Complaint, so they are not directly relevant to resolving Defendants' motion to dismiss. But the fact is that the Attorney General has made detailed allegations about Defendants' active participation in the fraud against Gemini, based on Defendants' own internal documents that have never been available to Gemini. All of those allegations are perfectly consistent with the natural inferences from the information available to Gemini that are set forth in Gemini's Complaint and discussed below. At a minimum, this underscores the reasonableness of those inferences—and counsels caution before accepting Defendants' self-servingly parsimonious account of the Complaint's allegations.

## BACKGROUND

### A.   DCG And Genesis's Lending Business

Defendant DCG is a cryptocurrency conglomerate, owning a large corporate umbrella of subsidiaries operating in the digital asset industry. Compl. ¶ 15. Defendant Silbert is the founder and CEO of DCG, as well as the company's controlling shareholder. *Id.* ¶ 16.

One of DCG's subsidiaries is Genesis, which was until November 2022 a provider of lending and borrowing services for digital assets and fiat currency. *Id.* ¶ 17. Genesis was among the largest lenders in the cryptocurrency industry. *Id.* ¶ 23. It obtained capital by borrowing from

depositors—in either cryptocurrency or U.S. dollars—and sought to earn profits based on the spread between the rates paid to those depositors and the rates it could receive in exchange for lending the borrowed assets. *Id.* ¶ 24.

Plaintiff Gemini is a trust company organized under the laws of the State of New York, which operates a cryptocurrency platform that enables its users to buy, sell, and store cryptocurrencies. Compl. ¶ 14. Beginning in February 2021, Gemini began offering a new program, called Gemini Earn, that gave Gemini users the opportunity to choose to loan their digital assets to Genesis. *Id.* ¶ 25. Those loans were governed by three-party Gemini Earn MLAs, each of which was executed by an individual Gemini Earn Lender, by Genesis as Borrower, and by Gemini as Custodian and authorized agent for the Gemini Earn Lender. *Id.* ¶ 26.

### B. Genesis's 3AC Losses

Genesis represented itself as a responsible financial institution in order to induce depositors to lend it their funds, and offered Gemini various assurances about its careful lending practices. Compl. ¶ 29-30. Genesis's MLAs with the Gemini Earn users also included a standing warranty of solvency. *Id.* ¶ 33-37.

Unfortunately, however, Genesis was not the careful lender that it portrayed itself to be. By June 2022, Genesis had lent approximately $2.3 billion to 3AC, a crypto-focused hedge fund based in Singapore. *Id.* ¶¶ 5, 40, 44. Much of this risky lending was used to fuel creations of shares in the Bitcoin Trust sponsored by another DCG subsidiary, Grayscale Investments, LLC (Grayscale). *Id.* ¶¶ 22, 46-48. It was in DCG's interest to fuel the creation of those shares because its subsidiary Grayscale earns a 2% annual fee on the net asset value of the assets in the Bitcoin Trust. *Id.* ¶ 48. But 3AC's risky investments ultimately led to the fund's collapse in June 2022, producing a loss for Genesis of *$1.2 billion*. *Id.* ¶ 44.

### C.   Defendants' Scheme To Mislead Gemini And Genesis's Depositors About Genesis's Financial Condition

As rumors about Genesis's 3AC losses swirled, Genesis and Defendants sought to reassure the market. On June 17, 2022, Genesis's then-CEO Michael Moro posted to Twitter "that we carefully and thoughtfully mitigated our losses with a large counterparty who failed to meet a margin call." Compl. ¶ 41. He added that "our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on." *Id.*

On July 6, 2022, Moro offered additional reassurances on Twitter. He stated that, following 3AC's default, "we worked with [DCG] to find the optimal strategy to further isolate the risk," and "DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term." Compl. ¶ 43. Various Genesis representatives communicated similar messages to Gemini and other Gemini depositors, claiming, for example, that "all of our loses [sic] have already been absorbed by DCG/realized on our balance sheet." *Id.* ¶ 53.

But those assurances were false, because DCG had not absorbed Genesis's 3AC losses. In fact, DCG and Genesis had agreed to a sham transaction in which DCG issued the DCG Promissory Note—which had a nominal face amount of $1.1 billion, but would not mature for ten years and accrued interest only at a rate of one percent annually. Compl. ¶ 57. With that duration and substantially below-market interest rate, the DCG Promissory Note was worth only a small fraction of its nominal face amount and thus did not offset the losses that Genesis incurred as a result of 3AC's collapse. *Id.* ¶¶ 57-58. Nor did the DCG Promissory Note provide sufficient value to return Genesis to solvency. *Id.* ¶ 81. In reality, the DCG Promissory Note was just a fraudulent accounting trick designed to convey the impression of support for Genesis—which was in fact

deeply insolvent—without requiring DCG to commit the financial resources necessary to make Genesis even close to whole for its 3AC losses. *Id.* ¶ 58.

Genesis and Defendants then set to work misrepresenting the nature of the DCG Promissory Note and Genesis's financial condition. Genesis distributed false financial reports to Gemini that treated the DCG Promissory Note as a current asset (even though it did not qualify as such) and falsely valued the DCG Promissory Note at its inflated face amount. Compl. ¶¶ 68-82. Genesis sent the same false reports to other depositors, including Bitvavo Custody B.V. (Bitvavo), a depositor based in Amsterdam, Netherlands. On July 19, 2022, DCG's then-Chief Operating Officer Mark Murphy held a call with Bitvavo's representative, during which Murphy repeated Genesis's lie that DCG had absorbed Genesis's 3AC losses. Compl. ¶ 91. Murphy and other high-ranking DCG representatives were thereafter copied on multiple email exchanges in which Genesis shared more false financial reports and misrepresentations about DCG's support. *Id.* ¶¶ 94-98.

### D.    Silbert Intervenes To Induce Gemini To Continue The Earn Program

On October 13, 2022, Gemini sent an email to Genesis providing 30 days' notice of the termination of the Earn program. Compl. ¶ 108. Silbert then intervened to set up a lunch meeting with one of Gemini's co-founders, Cameron Winklevoss. *Id.* ¶¶ 108-09.

During that meeting, on October 20, 2022, Silbert made multiple misrepresentations designed to induce Gemini not to discontinue the Earn program. Compl. ¶ 109. In particular, although Silbert was aware that Genesis was massively insolvent—and that the DCG Promissory Note would not provide meaningful value to Genesis for ten years—Silbert falsely claimed that Genesis faced only a short-term mismatch in the timing of its lending and borrowing. *Id.* ¶ 110-16. As a result of Silbert's misrepresentations, Gemini elected to delay the termination of the Gemini Earn Program—and not explore the possibility of pursuing more rapid termination or other relief, as Gemini would have done if Silbert had stated the truth. *Id.* ¶ 118.

### E.      Genesis Suspension Of Withdrawals And Bankruptcy

On November 16, 2022, Genesis announced that it was suspending redemptions by its depositors, a decision that Genesis attributed to market dislocation resulting from the collapse of Alameda Research, LLC and FTX. Compl. ¶ 122. On January 19, 2023, Genesis filed a petition for Chapter 11 bankruptcy relief. *Id.* ¶ 124. At the time, Genesis had loans outstanding to Gemini Earn users worth hundreds of millions of dollars in the aggregate. *Id.* ¶ 27.

Since Genesis's suspension of withdrawals in November 2022, Gemini has been subject to multiple lawsuits and regulatory proceedings relating to the Earn program, and has incurred millions of dollars in fees and expenses in the defense of those actions. Compl. ¶ 12.

### F.      Procedural History

Gemini commenced this proceeding in New York state court on July 7, 2023, with a two-count complaint asserting a claim for fraud and a claim for aiding and abetting fraud. Dkt. No. 1-1. Following removal to this Court, Defendants filed a motion to dismiss on August 10, 2023. Dkt. No. 16. Gemini filed its amended complaint on September 14, 2023, Dkt. No. 21, and Defendants thereafter filed their motion to dismiss the amended complaint. Dkt. No. 24.

## ARGUMENT

## I.      COUNT I STATES A CLAIM FOR FRAUD

### A.      The Complaint Validly Alleges That Defendants Conspired With Genesis To Defraud Gemini

The Complaint alleges, in careful detail, that Defendants acted in concert with Genesis to defraud Gemini and other Genesis depositors. For the most part, Defendants' motion to dismiss seeks to change the subject. According to the motion, Defendants bear no responsibility for Genesis's fraud, and if one looks exclusively to Defendants' own conduct, it could not support a fraud claim. As we explain below, even if this effort to narrow the frame were successful, it would

not exculpate Defendants from liability: Defendants directly committed fraud through their own affirmative misrepresentations and material omissions. *See* pp. 18-21, *infra*. More fundamentally, however, Defendants' repeated insistence that they are somehow strangers to Genesis's fraud is demonstrably incorrect. For that reason, all of the Complaint's allegations are relevant to Defendants' liability—and those allegations are plainly sufficient to survive a motion to dismiss.

At the outset, it is important to emphasize the critical points that Defendants do *not* dispute. First of all, Defendants do not dispute the blackletter proposition that, when co-conspirators "act[] in concert," each co-conspirator "may be held responsible in damages for any overt act or acts" of the conspiracy. *Rutkin v. Reinfeld*, 229 F.2d 248, 252 (2d Cir. 1956); *see also, e.g.*, *Kashi v. Gratsos*, 790 F.2d 1050, 1054 (2d Cir. 1986) ("Proof of a civil conspiracy under New York law connects a defendant with the transaction and . . . charges him with the acts and declarations of his coconspirators, and exposes that defendant to joint and several liability for the victim's losses." (citations and internal quotation marks omitted)). Defendants thus appear to agree that, if the Complaint's conspiracy allegations are well-pled, then Gemini may proceed against Defendants to recover for any damages resulting from Genesis's fraudulent misrepresentations.

Nor do Defendants meaningfully dispute that the Complaint alleges a breathtakingly brazen campaign of fraud by Genesis directed against Gemini and other Genesis depositors. Defendants glancingly suggest (Br. 13) that "Gemini does not allege with particularity anything false or misleading about Genesis's statements." But Defendants make no effort to develop that contention, and it is manifestly wrong in any event. In an effort to reassure Gemini and Genesis depositors, Genesis repeatedly claimed that DCG had assumed Genesis's losses from 3AC's collapse, when in fact DCG had not done so. *E.g.*, Compl. ¶¶ 41-43, 51-56, 63-66. Genesis then disseminated financial reports that falsely inflated the DCG Promissory Note's value in order to conceal

9

Genesis's insolvency; falsely treated the DCG Promissory Note as a "Current Asset" that could be realized in cash within a year, when it fact it had a ten-year term; and simply ignored the DCG Promissory Note altogether when necessary to hide its existence and terms from Gemini and other creditors. *Id.* ¶¶ 68-81. Genesis repeated those false statements, sometimes on a daily basis, as it used updated reports to lull Gemini into continuing the Earn program. *Id.* ¶ 82. Put simply, Genesis lied to Gemini—over and over again. That is the very essence of fraud, and Defendants do not seriously argue otherwise.

Defendants instead contend (Br. 19-20) that the Complaint's conspiracy allegations fall short because, in their view, the Complaint does not plausibly allege the existence of an unlawful agreement, the Complaint does not allege an overt act in furtherance of the conspiracy, and the conspiracy allegations are duplicative of the Complaint's claim for aiding and abetting fraud. None of those contentions withstands scrutiny.

### 1.    The Complaint Plausibly Alleges The Existence Of An Unlawful Agreement

Defendants' single-sentence argument that the Complaint "alleges no facts plausibly establishing the existence of an unlawful agreement" (Br. 20) fails to grapple with the Complaint's detailed factual allegations, which amply support an inference that Defendants and Genesis agreed to a scheme to defraud Gemini and Genesis's depositors. That argument should be rejected.

a. As the Complaint explains (Compl. ¶¶ 101-02), the existence of an unlawful agreement can readily be inferred from the basic nature of the DCG Promissory Note that was at the core of Defendants' fraudulent scheme with Genesis. Indeed, the DCG Promissory Note made sense *only if its existence and terms would be concealed* from Genesis's creditors. Thus, the DCG Promissory Note—a writing executed by Defendant Silbert on behalf of Defendant DCG—provides powerful circumstantial evidence of Defendants' unlawful agreement with Genesis. *See Cofacredit, S.A. v.*

*Windsor Plumbing Supply Co.*, 187 F.3d 229, 240 (2d Cir. 1999) ("[A]greements in civil conspiracies. . . may be inferred from circumstantial evidence.").

That understanding follows directly from the situation that Defendants and Genesis faced in the immediate aftermath of 3AC's collapse in June 2022. When 3AC defaulted, Genesis suffered a loss of $1.2 billion—more than one half of the $2.36 billion that Genesis had recklessly loaned to 3AC. Compl. ¶ 44. That massive loss immediately plunged Genesis into deep insolvency: Genesis's balance sheets for prior periods had showed equity values ranging from $182.2 million to $425.4 million—demonstrating that the $1.2 billion loss from 3AC's collapse would leave Genesis insolvent by hundreds of millions of dollars. *Id.* ¶ 103. And even when the DCG Promissory Note was included on Genesis's June 30, 2022, balance sheet at its inflated face value—which dramatically overstated its true worth on a present-value basis—it produced an equity value for Genesis of just $92.5 million. *Id.* ¶ 101. Thus, in the absence of a capital infusion to offset the losses, 3AC's collapse had left Genesis insolvent by *more than $ 1 billion.* To make matters worse, within days of 3AC's collapse, another DCG subsidiary borrowed more than $300 million worth of bitcoin from Genesis—which further diminished Genesis's liquidity and made it all the more important for Silbert and DCG to cover up the true state of Genesis's books. *Id.* ¶ 9.

Following the revelation of its 3AC losses, Genesis needed to reassure its depositors (and the broader market) that its losses would not threaten its ability to meet its obligations. The DCG Promissory Note was the purported basis on which Genesis offered those assurances, but it came nowhere close to addressing the impact of 3AC's collapse on Genesis's finances. As an initial matter, although the revelation of Genesis's massive losses threatened to strain Genesis's liquidity—as frightened depositors might seek to withdraw their funds from Genesis—the DCG Promissory Note did *nothing at all* to bolster Genesis's near-term liquidity. Compl. ¶ 101. In fact,

the DCG Promissory Note would not provide any meaningful resources to Genesis for a full ten years. Moreover, on any reasonable present-value basis, the DCG Promissory Note represented at most a small fraction of Genesis's losses from the 3AC collapse and fell far short of the kind of capital injection that would have maintained Genesis's solvency. *Id.* If the value of the DCG Promissory Note had been fairly presented, Genesis's balance sheets would have shown that Genesis was insolvent by hundreds of millions of dollars. *Id.*

Under these circumstances, the inescapable inference is that Defendants agreed with Genesis to conceal the existence and terms of the DCG Promissory Note. There would simply have been no point in making the DCG Promissory Note if Defendants had believed that it would be accurately valued on Genesis's books and accurately described to Genesis's counterparties. To the contrary, any accurate valuation of the DCG Promissory Note would have made clear that Genesis was deeply insolvent—and thus would have done nothing to reassure Genesis's depositors or avert a near-term collapse of its business. Compl. ¶ 103. The transaction made sense only if its existence and terms could be concealed, because that is what allowed DCG to *pretend* to support Genesis without committing the financial resources that would have been required to actually do so. *See id.*

Contrary to Defendants' argument (Br. 17), this inference does not rest on "Gemini's judgment about what DCG ought to have done as a business matter." Rather, it turns on basic logic and simple arithmetic. To recap: Genesis's losses from 3AC's collapse left it insolvent by more than $1 billion. Instead of providing additional capital in an amount sufficient to offset that loss, Defendants conspired with Genesis to issue the DCG Promissory Note, which left Genesis insolvent by hundreds of millions of dollars. There is no conceivable reason that Defendants would

have done so if they did not know that Genesis would conceal its insolvency from Gemini and Genesis depositors by falsely presenting the DCG Promissory Note's value.

Nor can Defendants credibly argue that they were unaware of this simple arithmetic. As discussed above, *see* pp. 11-12, *supra*, Genesis's balance sheets had consistently shown an equity value that was dwarfed by Genesis's $1.2 billion loss from the 3AC collapse. And Defendants were unquestionably familiar with Genesis's financial position, given the role that Genesis played in DCG's own consolidated financials and Genesis's role as a lender to another DCG entity. Compl. ¶¶ 61, 105. In July 2022, Genesis accounted for roughly two thirds of the $12.1 billion in total assets that DCG showed on a consolidated balance sheet, and more than *95.6%* of the $11.5 billion in total liabilities that DCG reported. *Id.* ¶ 105. Given the key role that Genesis played in DCG's broader business, it is implausible that Silbert and other DCG executives would not have understood that maintaining Genesis's solvency required sufficient support to actually offset the 3AC losses.

It is likewise implausible that Defendants would not have understood that the DCG Promissory Note came nowhere close to offsetting those massive losses. That much is apparent from what DCG itself has referred to, in the Genesis bankruptcy case, as "rudimentary finance principles like the time-value of money and compound interest,"[2] which provide that a debt obligation that does not mature for ten years and accrues only one-percent interest in the interim is worth only a small fraction of its face value. *See* Compl. ¶ 103.

---

[2] Dkt. No. 698, *In re Genesis Global Holdco, LLC*, No. 23-10063 (Bankr. S.D.N.Y), at 6; *see also id.* at 6-7 (stating that "it is clear that an $830 million payment over seven years at a 6% interest rate in exchange for the $1.1 billion promissory note over ten years at a 1% interest rate represents hundreds of millions of dollars of additional value").

b. In addition to the basic nature of the DCG Promissory Note, Genesis's behavior and DCG's active participation in Genesis's effort to mislead lend further support to the existence of an unlawful agreement to defraud.

Consider first the public statements by Genesis's then-CEO, Michael Moro, about the support that Genesis had received from DCG. On June 17, 2022, in the immediate aftermath of 3AC's collapse, he posted on Twitter that "our potential loss is finite and can be netted against our own balance sheet as an organization. We have shed the risk and moved on." Compl. ¶ 41. On July 6, he added that Genesis "worked with [DCG] to find the optimal strategy to further isolate the risk," and stated that "DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term." *Id.* ¶ 43. Of course, as Moro well knew, the DCG Promissory Note had offset only a small portion of the 3AC losses. *Id.* ¶ 103. That Moro could lie so brazenly—in public—without perceiving any risk that DCG would correct his misstatements is a further indication that Defendants were acting in concert with Genesis to conceal Genesis's true financial condition.

The same is true of DCG's direct participation in the effort to mislead, such as the multiple false statements that DCG's then-Chief Operating Officer Mark Murphy made to a representative of Bitvavo, another Genesis depositor, during a July 19, 2022, telephone call. Compl. ¶ 91.[3]

_____

[3] Defendants attempt to erect an unprecedented and illogical pleading burden by suggesting (Br. 12) that Murphy's call with Bitvavo can be ignored because "Gemini's allegations about the content of the call clearly are not based on personal knowledge, and Gemini does not explain the factual basis for these allegations." At the pleading stage, a plaintiff's burden is to make "[f]actual allegations" that "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Critically, "a complainant is not required to plead evidence" supporting those factual allegations. *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974). Defendants thus err in relying on *Stern v. Leucadia National Corp.*, 844 F.2d 997 (2d Cir. 1988). In that case, the Second Circuit stated that allegations of fraud made on information and belief "must be accompanied by a statement of facts upon which the belief is founded." *Id.* at 1003. Here, Murphy's call with Bitvavo is among the facts on which the Complaint's allegations of fraud are

Murphy stated, falsely, that DCG has stepped in to absorb Genesis's losses on its 3AC exposure, and that those losses had been netted against DCG's balance sheet. *Id.* He further stated, falsely, that Genesis was well-capitalized to continue doing business as normal in the future. *Id.* Those statements directly echoed misrepresentations that Genesis had previously shared with Bitvavo in a document entitled "Three Arrows Post-Mortem," which was itself identical to a document that Genesis shared with Gemini. Compl. ¶¶ 66-67, 86, 91. And Bitvavo received the very same fraudulent financial reports that Genesis had shared with Gemini. *Id.* ¶¶ 87-89. The natural inference is that Defendants had agreed with Genesis to disseminate the fraudulent story.[4]

DCG's further interactions with Bitvavo buttress that conclusion. Murphy and other DCG representatives were repeatedly copied on emails in which Genesis shared more fraudulent financial reports falsely presenting the DCG Promissory Note (identical to reports that Gemini received as well) and continued to lie about Genesis's financial condition. Compl. ¶¶ 94-98. DCG's representatives never corrected any of those lies. In one such email, Genesis's representative explained that his response had been prepared with assistance from the "Finance and Accounting teams at both DCG and Genesis." Compl. ¶ 94. No DCG representative objected to that statement. Nor did DCG's representative seek to correct the blatantly false information included in the response, which claimed that Genesis had approximately $922 million in outstanding loans to DCG—an amount that purposefully omitted the $1.1 billion DCG Promissory

---

grounded. *Stern* imposes an obligation to plead those facts, but it does not suggest any further obligation to plead evidentiary support.

[4] Defendants argue (Br. 12) that Gemini cannot recover in fraud for statements made to Bitvavo. But that argument misunderstands the relevance of DCG's participation in the effort to mislead Bitvavo. We do not contend that Gemini can recover for the fraudulent statements made to Bitvavo. Rather, the point is that DCG's direct participation in the effort to mislead Bitvavo— which was materially identical to the effort aimed at Gemini—supports an inference that Defendants acted in concert with Genesis in their broader scheme to defraud Gemini and Genesis's depositors.

Note. Compl. ¶ 96. And DCG did not seek to correct the false statement that DCG had "assumed the $1.1bn loan on June 30, 2022"—a misrepresentation calculated to reassure Bitvavo that Genesis had already been made whole for its loss on the 3AC loans. *Id.*

The natural inference from the repeated participation of DCG officers and employees in these fraudulent communications is that the effort to mislead Genesis's depositors was an agreed-upon common scheme. It is simply implausible that Genesis personnel would have included DCG's representatives—who could easily have corrected Genesis's lies about the support that DCG had purportedly provided—if DCG and Genesis had not agreed to conceal the truth from Genesis's depositors. *See* Compl. ¶ 99. Indeed, Defendants' motion does not advance any other possible explanation for DCG's participation.

c. Finally, the existence of an unlawful agreement can be inferred from Silbert's own personal participation in perpetuating the lie that Genesis was solvent and capable of honoring its obligations. At an October 20, 2022, lunch meeting with Gemini's co-founder, Cameron Winklevoss, Silbert (acting on behalf of DCG) made numerous misrepresentations designed to induce Gemini not to terminate the Earn program. Compl. ¶¶ 108-18.

As we explain below, pp. 18-21, *infra*, Silbert's misrepresentations and material omissions are sufficient to state a direct claim for fraud against Defendants, without considering any of Genesis's statements to Gemini. The critical point for present purposes, however, is that Silbert's misrepresentations and omissions were of a piece with Genesis's fraud against Gemini: Like Genesis, Silbert sought to conceal both the existence of the DCG Promissory Note and Genesis's insolvency. And as with Genesis, he did so in order to dissuade Gemini from terminating the Earn program—thus avoiding withdrawals of Earn deposits from Genesis. Given those similarities, the natural inference is that Defendants were engaged with Genesis in a concerted scheme to defraud.

### 2.   The Complaint Alleges Multiple Overt Acts In Furtherance Of The Conspiracy

Defendants also err in contending (Br. 20) that the Complaint "does not allege an 'overt act' in furtherance of the conspiracy." That element is satisfied, most obviously, by Defendant Silbert's execution of the DCG Promissory Note on behalf of Defendant DCG. Compl. ¶ 57. Contrary to Defendants' characterization, this is not a situation in which a defendant's otherwise lawful conduct merely happened to contribute to a fraud committed by someone else. As we have explained, the DCG Promissory Note was at the core of Defendants' unlawful scheme—it was the mechanism by which DCG could *pretend* to provide support for Genesis, while misleading Genesis's creditors about the nature and extent of that support. *See* p. 12, *supra*. It was a fraudulent act, not an innocent one.

Moreover, Silbert's lunch meeting with Cameron Winklevoss constitutes an additional overt act in furtherance of the conspiracy. *See* pp. 7, 16, *supra*. Defendants' motion does not argue otherwise.

### 3.   The Complaint's Fraud Allegations Are Not Improperly Duplicative

Defendants contend (Br. 19-20) that the Complaint's conspiracy theory overlaps with the Complaint's aiding-and-abetting claim, and should thus be dismissed as duplicative. That is incorrect.

As an initial matter, Defendants fail to acknowledge that they seek dismissal of the aiding-and-abetting claim as well. *See* Br. 21-25. If they were to succeed in that effort, then there would be no basis to dismiss the conspiracy allegations as duplicative. *See In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d 395, 475 (S.D.N.Y. 2019) (dismissing conspiracy claims as duplicative only when parallel aiding-and-abetting claims survived).

Defendants also exaggerate the degree of overlap between the Complaint's conspiracy allegations and the aiding-and-abetting claim. The former alleges a conspiracy—*i.e.*, an unlawful agreement to commit fraud. Compl. ¶ 135. The latter turns on Defendants' affirmative assistance to Genesis in making fraudulent misrepresentations to Gemini, *id.* ¶ 139, and thus would impose liability on Defendants even in the absence of an agreement with Genesis.

In addition, Defendants suggest that the legal consequences of the two claims may differ. In particular, Defendants appear to contend (Br. 24-25) that damages on a claim for aiding and abetting fraud include only those losses that are proximately caused by the defendant's own conduct. By contrast, a showing of conspiracy leads to joint and several liability for all losses caused by the co-conspirators. *See Kashi*, 790 F.2d at 1054. To the extent that a successful conspiracy claim may lead to a more favorable measure of damages, there is no apparent reason that a plaintiff should lose out on that right merely because the complaint includes an alternative claim for aiding-and-abetting. The Court should accordingly decline to dismiss any claim or theory as duplicative of another at this early stage. *In re Platinum-Beechwood Litig.*, 427 F. Supp. 3d at 451 (declining to dismiss unjust enrichment claims that were "not completely duplicative" and were "framed as an alternative").

### B. The Complaint Alleges That Defendants Made Fraudulent Misstatements To Gemini With The Requisite Scienter

Defendants challenge (Br. 10-12, 15-17) the Complaint's allegations that Defendants made false and materially misleading statements directly to Gemini, with the scienter required to establish a claim of fraud. But Silbert's statements at his October lunch meeting with Winklevoss were actionable as fraud, and they were made with knowledge of their falsity.

1.     **Silbert Made Affirmatively False And Materially Misleading Statements Directly To Gemini**

Silbert's statements to Winklevoss were actionable as fraud on two independent bases. First, Silbert misled by omission when he stated that Genesis faced a timing problem caused by a short-term mismatch between its outstanding loans and borrowings. Compl. ¶ 114. Even if that statement were literally true (and it was not, as we explain below), it would at best be a misleading half-truth that was designed to conceal Genesis's insolvency. *Id.* ¶ 115. Genesis could not possibly be understood as facing *only* a timing issue, because its balance sheet was massively insolvent. Compl. ¶ 115; pp. 11-12, *supra*. But Silbert disclosed only the timing issue, thereby conveying the message that Genesis was not facing a solvency crisis. This sort of materially misleading partial disclosure is actionable as fraud. *See* Restatement (Second) of Torts § 529 ("A representation stating the truth so far as it goes but which the maker knows or believes to be materially misleading because of his failure to state additional or qualifying matter is a fraudulent misrepresentation."); *Vtech Holdings Ltd. v. PricewaterhouseCoopers LLP*, 348 F. Supp. 2d 255, 272 (S.D.N.Y. 2004) ("A statement that is ambiguous or a half-truth may ground liability in fraud if the speaker knows it to be materially misleading and does nothing to correct the misunderstanding.").

Second, Silbert affirmatively misrepresented Genesis's financial condition by falsely claiming that Genesis's timing issue was limited to a *short-term* mismatch. Compl. ¶ 114. At the time, Gemini had provided 30 days' notice of the termination of the Earn program. *Id.* ¶ 108. Silbert knew, but did not disclose, that Genesis's assets included the DCG Promissory Note, which would not bring meaningful value to Genesis for almost *ten years*. *Id.* ¶ 116. With the DCG Promissory Note included, the weighted average duration of Genesis's outstanding loans was over two years. *Id.* This is not a short-term timing issue—certainly not in the context of discussions about termination of the Earn program *within a month*. *See id.* Indeed, although Defendants argue

19

(Br. 11) that Silbert's statement was merely opinion or was too vague to be actionable as fraud, Defendants do not identify any plausible basis upon which Silbert could have concluded that Genesis faced only a short-term timing issue, as Silbert falsely claimed.

### 2. The Complaint's Factual Allegations Raise A Strong Inference Of Scienter

Defendants are likewise wrong to argue (Br. 15-17) that the Complaint's allegations do not raise a strong inference of scienter. Defendants primarily argue (Br. 15-16) that the Complaint's allegations do not establish scienter on the basis of motive and opportunity. But that argument tilts at a windmill: The Complaint does not seek to establish scienter by pleading motive and opportunity. Rather, this is a straightforward case of "conscious misbehavior." *IKB Int'l S.A. v. Bank of Am. Corp.*, 584 F. App'x 26, 27-28 (2d Cir. 2014); *see also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 614 (S.D.N.Y. 2015) (conscious misbehavior is established when the defendant has "knowledge of facts or access to information showing" falsity).

Defendants entirely ignore the Complaint's allegations that Silbert knew that his statements were false. *See* Compl. ¶ 110. That inference is well-supported. Defendants do not contest that, as the CEO of DCG, Silbert was familiar with the financial reports of Genesis, one of DCG's key subsidiaries. *See id.* As a signatory of the DCG Promissory Note, moreover, Silbert was familiar with its terms—including its ten-year maturity, which falsified Silbert's claims about a short-term timing problem. *See id.* And he likewise understood that the minimal value provided by the DCG Promissory Note could not have offset Genesis's massive 3AC losses, and that Genesis was thus massively insolvent. *Id.* ¶ 110, 112; *see also* pp. 11-12, *supra* (explaining how the DCG Promissory Note was designed to *pretend* to address Genesis's insolvency). The Complaint thus

plausibly alleges that Silbert knew that his statements to Winklevoss were false and materially misleading, which is more than sufficient to establish scienter.

### C.    The Complaint Alleges Actionable Damages And Causation

Defendants' various challenges to the Complaint's allegations of damages and causation are likewise unpersuasive.

First, Defendants contend (Br. 17-18) that Gemini cannot recover fees and expenses incurred in litigation relating to the Earn program because the lawsuits are based on Gemini's own alleged misconduct. That misses the point. It is no surprise that parties who have brought claims against Gemini have alleged misconduct by Gemini. But those claims are nonetheless attributable to Defendants' fraud, because that fraud dissuaded Gemini from terminating the Earn program prior to Genesis's suspension of withdrawals. *See* Compl. ¶¶ 7, 118, 128, 132, 134. To state the obvious, if Gemini had terminated the Earn program and had been able to return Earn users' deposits, then those users would have had no motive to assert claims against Gemini. Thus, Defendants' fraud prevented Gemini from taking a step that would have eliminated—or at least reduced—the claims asserted against Gemini relating to the Earn program. *Id.* ¶ 128.

Second, Defendants contend (Br. 19) that Gemini's claim for damages rests on impermissible speculation and a supposedly attenuated chain of events. As just explained, however, Gemini's damages rest on a straightforward causal theory: Had Defendants not succeeded in concealing Genesis's insolvency and dissuading Gemini from terminating the Earn program, then Gemini could have terminated the Earn program before Genesis suspended withdrawals, and thus could have returned users' deposits. Whether or not that would have entirely eliminated the litigation that has been asserted against Gemini, it surely would have reduced the scope of that litigation. And as a logical matter, that is all that is necessary to establish a claim for damages. Dismissal would be improper here, given that the Complaint "describe[s] the alleged

causal relationship between breach and damages, allowing the Court to draw the reasonable inference that the breach proximately caused *some measure of damages*." *Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*, No. 15-CV-2044 (AJN), 2016 U.S. Dist. LEXIS 5441, at *21 (S.D.N.Y. Jan. 15, 2016) (emphasis added).

Third, Defendants argue (Br. 19) that the role of FTX's collapse in Genesis's ultimate failure excuses them from liability here, because it was an "unforeseeable" event that "severs any plausible chain of causation." But that is a factual assertion by Defendants, not an allegation in the Complaint. The Complaint alleges only that Genesis "*attributed*" its decision to suspend withdrawals to FTX's collapse. Compl. ¶ 122 (emphasis added). Whether the FTX collapse played any real role in Genesis's decision to halt withdrawals—or instead presented Genesis and DCG with a convenient story they could use to explain Genesis's failure without revealing their fraudulent conduct—will be borne out in discovery.

Moreover, and in any event, the same suggestion of an "unforeseeable" supervening cause could be made in a great many cases in which a defendant's fraud consists of misrepresenting the creditworthiness of a borrower whose subsequent default leads to losses. There will frequently be some precipitating event that ultimately leads to the borrower's default, but that has never been understood to exculpate the fraudster whose lies exposed the lender to that risk in the first place. As the New York Court of Appeals explained in rejecting a materially identical argument, a "[c]hange of conditions" in the broader market may be "a subsidiary cause" of the plaintiff's harm, but it is "not an *independent* cause" that would interrupt the chain of causation. *Hotaling v. A. B. Leach & Co.*, 159 N.E. 870, 873 (N.Y. 1928) (emphasis added).[5]

---

[5] *See also* Restatement (Second) of Torts § 548A cmt. b ("[W]hen the financial condition of a corporation is misrepresented and it is subsequently driven into insolvency by reason of the depressed condition of an entire industry, which has no connection with the facts misrepresented,

## II.     COUNT II STATES A CLAIM FOR DEFENDANTS' AIDING AND ABETTING OF GENESIS'S FRAUD

Defendants briefly challenge (Br. 21-25) Count II of the Complaint, which asserts a claim against Defendants for aiding and abetting Genesis's fraud against Gemini. Their arguments are unpersuasive.

### A.     The Complaint Validly Alleges Actual Knowledge Of Genesis's Fraud

Defendants first argue (Br. 21-22) that the Complaint fails to plead actual knowledge of Genesis's fraud. That argument is mistaken for largely the same reasons as Defendants' argument that the Complaint does not plead an unlawful agreement.

As discussed above, the DCG Promissory Note is explicable only if Defendants understood that Genesis would conceal and misrepresent its terms to Gemini and Genesis's depositors. *See* pp. 12-13, *supra*. Thus, in the unlikely event that the nature of the transaction was not enough to justify an inference that Defendants *agreed* with Genesis to defraud Gemini and Genesis' depositors, it would surely justify an inference that Defendants at least *knew* of Genesis's fraud. Moreover, Genesis's fraud was broadcast in public, through multiple Twitter posts that falsely represented the support that DCG purportedly had provided to Genesis. *See* pp. 6, 14, *supra*. Those public posts likewise support an inference that Defendants knew of the Genesis fraud. And the same is true of Silbert's own statements at his October 2022 lunch meeting with Cameron Winklevoss. *See* pp. 19-21, *supra*. Those statements were of a piece with Genesis's fraud, and they thus support an inference that Defendants knew of that fraud and sought to further it.

---

it may still be found that the misrepresentation was a legal cause of the recipient's loss, since it may appear that if the company had been in sound condition it would have survived the depression . . . .").

**B.    The Complaint Validly Alleges That Defendants Affirmatively Assisted Genesis's Fraud**

The DCG Promissory Note also demonstrates Defendants affirmative assistance in carrying out Genesis's fraud. As explained above, the DCG Promissory Note was tailor-made to facilitate Genesis's fraud: It offered a headline number that could support the fraudulent story that DCG had stepped in to support Genesis in the aftermath of 3AC's collapse, even though that support was in fact illusory and Genesis was left insolvent by hundreds of millions of dollars. *See* pp. 11-12, *supra*. In other words, the DCG Promissory Note was instrumental to effectuating Genesis's fraud, and it plainly constitutes affirmative assistance of that fraud.

Silbert's misrepresentations to Winklevoss likewise constitute affirmative assistance of Genesis's fraud. As Defendants acknowledge (Br. 23), the affirmative-assistance element can be satisfied by conduct that "helped to conceal" another's fraud. *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 547 (S.D.N.Y. 2007). That is precisely what Silbert did by lying to hide Genesis's insolvency from Winklevoss. That had the effect of further delaying the termination of the Earn program—and thus prolonging Genesis's fraud against Gemini. *See* p. 21, *supra*.

**C.    The Complaint Validly Alleges That Defendants Proximately Caused Gemini's Injuries**

Defendants err in contending (Br. 24-25) that their substantial assistance of Genesis's fraud did not proximately cause Gemini's injuries. Their argument largely duplicates their challenge to damages and causation with respect to Count I, and it is mistaken for the same reasons. *See* pp. 21-22, *supra*. To the extent that the argument differs at all, Defendants appear to argue (Br. 24-25) that liability is proper only when damages arise as a proximate result of the Defendants' own conduct, as opposed to the fraud that Defendants assisted more broadly. But that question is academic here, because Defendants' affirmative assistance includes the execution of the DCG Promissory Note. The DCG Promissory note was the fundamental premise of Genesis's entire

fraudulent scheme, *see* 11-12, *supra*, so all of the injuries alleged in the Complaint are properly understood to be a proximate result of Defendants' conduct.

## III.   IN ALL EVENTS, LEAVE TO AMEND SHOULD BE GRANTED IF ANY PORTION OF THE COMPLAINT IS DISMISSED

Defendants assert, without argument, that any dismissal should be with prejudice. *See* Br. 25. But there is no basis here to overcome Federal Rule of Civil Procedure 15(a)(2)'s directive that "[t]he court should freely give leave when justice so requires." That is particularly true given the filing of New York Attorney General's recent complaint, which contains significant new factual detail about Defendants' active role in the Genesis fraud. *See* Ex. A; pp. 3-4, *supra*. If any portion of the Complaint were to be dismissed, the dismissal should be without prejudice in order to afford Gemini an opportunity to incorporate that new detail into an amended pleading.

## CONCLUSION

Defendants' motion to dismiss should be denied.

Dated: October 20, 2023                         Respectfully Submitted,

By: /s/ Mark T. Stancil

**WILLKIE FARR & GALLAGHER LLP**
Mark T. Stancil (pro hac vice pending)
Donald Burke (pro hac vice pending)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000

**JFB LEGAL, PLLC**
John F. Baughman
Andrew Bosse
299 Broadway – Suite 1816
New York, NY 10007
(212) 548-3212

*Attorneys for Gemini Trust Company, LLC*

25